648 A.2d 595

Louis A. MEIER, M.D., Alphonse DiGiovanni, M.D., Robert Driscoll, D.O., Arthur Martella, M.D., Petitioners,

v.

Cynthia MALESKI, Acting in her Official Capacity as Insurance Commissioner of the Commonwealth of Pennsylvania, and Joseph Pulcini, Director of the Medical Prof. Liability Catastrophe Loss Fund, Respondents.

Commonwealth Court of Pennsylvania.

Argued Jan. 31, 1994.

Decided Sept. 16, 1994.

460

Daniel M. Gray, for petitioners.

Jeffrey P. Soderstedt, Dept. Counsel, for respondent Cynthia Maleski, Ins. Com'r.

Marybeth S. Christiansen, for respondent Joseph Pulcini, Director of the Medical Prof. Liability Catastrophe Loss Fund.

Before COLINS and FRIEDMAN, JJ., and LORD, Senior Judge.

FRIEDMAN, Judge.

Presently before this court are the preliminary objections of Cynthia Maleski (Commissioner), acting in her official capacity as Insurance Commissioner of the Commonwealth of Pennsylvania, and Joseph Pulcini (Director), Director of the Medical Professional Liability Catastrophe Loss Fund (collectively, Respondents), to the Amended Petition for Review in the Nature of a Complaint in Equity (Petition) of Louis A. Meier, M.D., Alphonse DiGiovanni, M.D., Robert Driscoll, D.O., and Arthur Martella, M.D. (collectively, Petitioners), filed in our original jurisdiction.[1] We overrule the preliminary objections.

Through their Petition, Petitioners seek both injunctive relief and an accounting because of Respondents' alleged violation of a provision of the Health Care Services Malpractice Act (Act).[2] Specifically, Petitioners challenge Respondents' calculation of the annual surcharge assessed against Petitioners and other Pennsylvania health care providers by the Medical Professional Liability Catastrophe Loss Fund (CAT Fund or Fund) for years 1987, 1988, 1990 and 1991. Petitioners contend that because Respondents failed to follow the Pennsylvania General Assembly's statutory scheme for determining the annual surcharge, Petitioners were assessed excessive surcharge amounts during those years.

Petitioners base their challenge on section 701(e)(1) of the Act, 40 P.S. § 1301.701(e)(1), which establishes the process for setting the surcharge amount as follows:

> The fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on all health care providers entitled to participate in the fund. The surcharge shall be determined by the director appointed pursuant to section 702 and subject to the prior approval of

1. Petitioners originally filed a Petition for Review in the Nature of a Complaint in Equity on July 21, 1993. Subsequently, Petitioners filed an Amended Petition for Review in the Nature of a Complaint in Equity along with an Application for Special Relief in the Form of a Motion for Preliminary Injunction. Petitioners withdrew their Application for Special Relief without prejudice on January 11, 1994.

2. Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. §§ 1301.101– 1301.1006.

the commissioner. The surcharge shall be based on the cost to each health care provider for maintenance of professional liability insurance and shall be the appropriate percentage thereof, necessary to produce an amount sufficient to reimburse the fund for the payment of all claims paid and expenses incurred during the preceding calendar year *and to provide an amount necessary to maintain an additional $15,000,000.*

40 P.S. § 1301.701(e)(1) (emphasis added).

Respondents claimed overcharge for 1987, 1988, 1990 and 1991 is based on an interpretation of section 701(e)(1) of the Act asserting that the Act imposes a $15,000,000 ceiling on the CAT Fund's annual surplus, so that any surplus in excess of this cap must be applied to reduce the surcharge for the upcoming year. Because Respondents' surcharge calculation did not accord with this $15,000,000 surplus cap, Petitioners seek credit for the four years that the CAT Fund's surplus exceeded $15,000,000.

In their Petition, Petitioners aver that they are physicians licensed in Pennsylvania who are also "health care providers" as defined by section 701(a)(1)(i) of the Act, 40 P.S. § 1301.701(a)(1)(i). As such, Petitioners must comply with all Act provisions or be subject to suspension of their licenses. 40 P.S. § 1301.701(f). (Petition, ¶ 2.) In support of Petitioners' request for relief, the Petition also contains the following relevant allegations, which we summarize as follows.

In 1975, the Pennsylvania General Assembly approved the Act and created the CAT Fund to pay awards, judgments and settlements which medical liability claimants obtained from health care providers when the awards exceeded the health care provider's basic liability insurance coverage. (Petition, ¶ 3.)[3] As a condition of licensure, health care providers must

---

3. A primary purpose in establishing the CAT Fund was to assure the availability of reasonably priced professional liability insurance for all Pennsylvania health care providers and to insure that persons injured as a result of medical malpractice may obtain prompt adjudication of their claims and receive reasonable compensation for those claims. 40 P.S. § 1301.102. To this end, the Fund provides additional profession-

pay a fee on or after January 1 of each year to reimburse the CAT Fund for expenditures made during the preceding year. The amount of this fee, known as the surcharge, is determined by the Director and is subject to prior approval by the Commissioner. 40 P.S. § 1301.701(e)(1). (Petition, ¶¶ 4–6). The surcharge collected must be sufficient to reimburse the CAT Fund for the awards, judgments and settlements resolved (claims paid) during the prior 12 month period ending August 31 and for the Fund's administrative expenses incurred during the preceding calendar year. In addition to generating this sum, the surcharge must also fund an additional $15,000,000. 40 P.S. § 1301.701(e)(1). Should the Fund be exhausted by the payment of expenses and claims which have become final, the Commissioner has authority to levy an emergency surcharge to meet the shortfall. 40 P.S. § 1301.701(e)(3). (Petition, ¶¶ 7, 8). The Fund generally submits its surcharge filing to the Commissioner during the autumn of a given year; the Commissioner then gives public notice of the filing and approves a surcharge. In December, following Commissioner approval, the Director advises interested parties of the upcoming year's surcharge. (Petition, ¶ 9).[4]

According to Petitioners, section 701(e)(1) of the Act mandates that Respondents follow a simple mathematical formula in determining the appropriate surcharge percentage for the upcoming year. First, they must compute the claims history and expenses of the past year. Second, because the surcharge should generate an amount sufficient to cover these costs plus an additional $15,000,000, Respondents must review the Fund's year end filing balance and, if it exceeds the $15,000,-

al liability coverage of up to $1,000,000 over and above the "basic coverage insurance" which eligible health care providers are required to have. 40 P.S. § 1301.701(d). Annual and emergency surcharges levied on health care providers along with any income realized by their investment or reinvestment provide the sole and exclusive source of funding for the CAT Fund. 40 P.S. § 1301.701(e)(1)–(4).

4. The private insurance companies which provide health care providers such as Petitioners with basic insurance coverage collect the surcharge on behalf of the Fund; these private carriers then remit the surcharge fee to the CAT Fund. (Petition, ¶ 10.)

000 statutory cap, Respondents must reduce the total by the excess amount. Finally, Respondents divide this new total by 1% of the total fees paid by health care providers for their basic coverage, an amount provided to Respondents by the commercial carriers writing that basic medical malpractice coverage.[5] Presuming that Respondents had computed these percentages in compliance with the Act, Petitioners paid the surcharges levied for the upcoming years of 1986–93. (Petition, ¶¶ 15–16.)

After reviewing the Fund's annual reports for 1986–91 and unverifiable information from the Fund's projected filing of 1993,[6] Petitioners learned that the CAT Fund's year end balances exceeded the $15,000,000 statutory buffer in the years 1986, 1987, 1989 and 1990 as follows:

| | |
|---|---|
| 1986–$22,429,825 | 1990–$26,577,189 |
| 1987–$72,940,236 | 1991–$ 9,620,461 |
| 1988–$56,390,956 | 1992–$12,788,408 |
| 1989–$52,527,982 | (unverifiable) |

Applying the previously noted mathematical formula to the CAT Fund's annual reports and unverifiable projected premium information, Petitioners alleged upon information and belief that Respondents violated the Act by failing to reduce the CAT Fund's year-end balance for calendar years 1986, 1987, 1989 and 1990 to the $15,000,000 mandated by the Act, so that Petitioners may have been overcharged for upcoming years 1987, 1988, 1990 and 1991. (Petition, ¶¶ 28–29.) Moreover, Petitioners assert that because Respondents have consistently failed to comply with the Act's surplus provision, Respondents

5. Petitioners illustrate this formula by means of the following equation.

$$\frac{\text{AMOUNT TO BE GENERATED BY SURCHARGE (Total claims and expenses less any excess over \$15,000,000)}}{\text{1\% OF PREMIUMS OF ALL PENNSYLVANIA BASIC MALPRACTICE COVERAGE}} = \text{SURCHARGE PERCENTAGE}$$

6. Petitioners claim that they requested projected premium information from Respondents in order to compute the annual surcharge. However, Respondents provided only unverifiable information for surcharge years 1986–92 but would not release written reports that would have enabled Petitioners to determine conclusively whether Respondents overcharged them for the years in question. (Petition, ¶¶ 25–27.)

exhibit a course of conduct indicating that future violations may occur whenever the Fund's year-end balance exceeds $15,000,000 unless a court order requires Respondents to disgorge excess surplus above $15,000,000 prior to determining rates for 1994 and subsequent years. Otherwise, Pennsylvania health care providers will incur improper costs which will likely be passed to the public in the form of more expensive health care services. (Petition, ¶¶ 30–31.)

The Petition states two counts for relief. In Count I, Petitioners seek an order enjoining Respondents from collecting any further 1993 surcharge fees or using 1993 surcharge fees to pay CAT Fund claims and expenses until this court directs Respondents to recompute Petitioners' 1987–1991 surcharges by subtracting CAT Fund surplus amounts exceeding $15,000,000 from the 1987–1991 gross premium amount to be generated by those surcharges. Petitioners ask that if they paid excess amounts during any of those 1987–91 surcharge years, then Petitioners' surcharge rates for 1993 and subsequent years should be reduced by the amount of the excess fees paid by Petitioners during those years along with accrued interest for that period. (Petition, ¶ 32.)

In Count II of the Petition, Petitioners claim entitlement to an accounting of all Respondents' financial transactions pertaining to the formulation of the surcharge fees assessed on Petitioners for years 1987–93, information which Petitioners previously requested from Respondents but which Respondents failed to provide. Because Petitioners believe that these records, currently in Respondents' possession, will prove their allegations regarding Respondents' 1987–93 surcharge determinations, they seek an order requiring Respondents to provide a full accounting of all CAT Fund surcharge determinations assessed to Petitioners and other Pennsylvania health care providers during the surcharge years 1987–1993. (Petition, ¶¶ 33–37.)

Respondent Director filed preliminary objections to the Petition, contending that the Petition should be dismissed on any one of five separate grounds: (1) that the amended petition violates Commonwealth Court Internal Operating

Rule 414 regarding the use of unreported opinions; (2) that this case presents no actual controversy;[7] (3) that Petitioners failed to exhaust their administrative remedies; (4) that this action is barred by the doctrine of laches; and (5) that Petitioners fail to state a claim upon which relief can be granted.

Respondent Commissioner also filed preliminary objections, exactly repeating the Director's first, third, fourth and fifth bases for dismissal of the Petition and adopting the Director's arguments in support of those bases. In addition, the Commissioner asserts that even if this case is not dismissed on one of those four grounds, it should at least be dismissed with regard to the Commissioner for failure to state a cause of action against the Commissioner for which relief can be granted.

Initially, we note that in ruling on a preliminary objections, we must accept as true all well-pleaded material allegations in the petition for review as well as all inferences reasonably deduced therefrom. *Pennsylvania Chiropractic Federation v. Foster,* 136 Pa.Commonwealth Ct. 465, 583 A.2d 844 (1990). The court need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. *Martin v. Commonwealth,* 124 Pa.Commonwealth Ct. 625, 556 A.2d 969 (1989). In order to sustain preliminary objections, it must appear with certainty that the law will not permit recovery, and, any doubt should be resolved by a refusal to sustain them. *Pennsylvania State Troopers Association v. Commonwealth,* 146 Pa.Commonwealth Ct. 467, 606 A.2d 586 (1992). With these standards in mind, we consider Respondents' preliminary objections.

## I.

Respondents first maintain that Petitioners' claim and demand for relief is predicated upon a 1988 unreported single-

7. Although discussed in the Director's brief and responded to by Petitioners in their brief, we note that the Director did not actually include this issue in his filed preliminary objections.

judge opinion of this court, in violation of section 414 of the Commonwealth Court Internal Operating Procedures, which provides as follows:

**Reporting of Opinions; Certain Decisions not to be Cited**—Unreported opinions of the court shall not be cited in any opinion of this court or in any brief or argument addressed to it, except that any opinion filed in the same case may be cited as representing the law of the case. A one-judge opinion, even if reported, shall be cited only for its persuasive value, not as binding precedent. This rule shall be effective retroactively, so as to apply to opinions filed before the effective date of this section, as well as to opinions filed in the future.

210 Pa.Code § 67.55, *as amended* in 24 Pa.B. 1835 (1994).

Moreover, Respondents assert that because Petitioners have quoted so extensively from this opinion,[8] the Petition cannot be selectively stricken to bring the pleading into conformance with this court's internal rule. Therefore, Respondents assert that the Petition should be stricken in its entirety. Pa.R.C.P. No. 1028(a)(2).

In response, Petitioners maintain that they do not use this court's unpublished opinion as binding precedent but only to enlighten the court by providing factual background regarding Respondents' alleged violations. They argue that because the facts and issues in that prior action are so similar to those here, they would be remiss if they failed to inform everyone of the relevant information contained in that ruling, particularly where the "ruling is the only recorded *authority on the issues* presently before the court." (Petitioners' brief at 16) (emphasis added).[9]

---

**8.** Petitioners have either referred to or quoted directly from that opinion in paragraphs 17–30 of the Petition. Petitioners also attached a copy of the opinion as an exhibit to their pleading.

**9.** Notwithstanding Petitioners' claim to the contrary, we note that the phrasing of Petitioners' own argument, quoted from their brief, at least implies that Petitioners cite this court's unpublished opinion with the intent that we will consider it as binding authority.

■   Whatever the intended purpose, we agree with Respondents that Petitioners have improperly cited and quoted from a one-judge unpublished opinion of this court; accordingly, we strike all references to that opinion made in the Petition and do not consider any arguments which Petitioners base solely on that opinion.[10]   However, we decline to strike the entire Petition.   We disagree with Respondents' contention that striking the offending paragraphs from the Petition eliminates virtually every one of Petitioners' substantive allegations and renders the complaint unintelligible.   Therefore, we overrule Respondents' first preliminary objection and consider those portions of the Petition which now remain.

## II.

Second, Respondent Director claims that even if Petitioners' theory is correct, and section 701(e) of the Act does impose a $15,000,000 ceiling on the Fund's annual surplus, we must nevertheless dismiss the Petition for lack of jurisdiction because Petitioners allege no immediate controversy or current injury but, rather, allege only that they may have been overcharged in the past.   The Director points out that 1991 is the most recent year for which Petitioners challenge Respondents' "improper" surcharge calculation, and he asserts that because Petitioners do not allege any harm from the present surcharge and cannot know if they will ever be overcharged again, Petitioners' interest is too remote and speculative to warrant judicial resolution of the issue at this juncture.[11]

10.   The Petition contains 37 paragraphs.   In order to eliminate all references to this court's unpublished opinion, we strike paragraphs 17–24 in their entirety.   We also strike portions of paragraphs 25–30. Accordingly, we have eliminated any reference to these stricken sections of the Petition in our recitation of Petitioners' allegations.

11.   In fact, the Director contends that as a practical matter, Petitioners cannot even demonstrate any past injury because they have never paid to the Fund any more than they actually owed.   The Director reasons that by law, surcharge monies can only be used to pay claims against eligible health care providers and Fund expenses, and if the amount collected in a particular year is insufficient to cover the claims and expenses of that year, the Fund makes up any difference by drawing on the surplus accumulated from prior years.   The Director notes that, in fact, the surpluses have been drawn down over the years and have

*Woods Schools v. Department of Education,* 100 Pa.Common-wealth Ct. 375, 514 A.2d 686 (1986); *Chester Upland School District v. Commonwealth,* 90 Pa.Commonwealth Ct. 464, 495 A.2d 981 (1985). We disagree.

■ This case is distinguishable from the cases cited by Respondents. In both *Chester Upland* and *Woods,* we determined that no justiciable controversy existed where events which could give rise to an actual controversy had not yet and might never occur.[12] By contrast, Petitioners here allege that Respondents already have acted improperly by failing to comply with the Act's provisions.

Moreover, contrary to the Director's claim, Petitioners do not limit their challenge to past years but, rather, question the amount of every surcharge from 1987 through 1993, as evidenced by their demand for an accounting of all 1987–93 surcharge determination records. (Petition, ¶¶ 34–37.) Although, based on the information available to them, Petitioners are only able to allege "upon information and belief" that Respondents "violated the Act" from 1987–91, (Petition at ¶ 28), this does not mean that Petitioners are satisfied that Respondents have complied with the Act since 1991. Rather,

remained below $15,000,000 for the past several years, thus establishing the fact that Petitioners would have had to pay, in one form or another, the money they did pay to and now seek to recover from the Fund.

12. In *Chester Upland,* a school district challenged the constitutionality of an amendment to the public school code which prohibited some school districts from having residency requirements for employees. The school district had taken preliminary steps to discharge certain employees for failure to reside within the district and alleged that those employees, claiming protection under the amendment, threatened to bring legal action against the district if they were terminated. However, because the school district's petition contained no averments that the employees ever sought to enforce the amendment, or that such action was imminent or inevitable, we held that a declaratory judgment was inappropriate.

In *Woods,* a private school sought an order for proceedings to disenroll an exceptional student or, alternatively, to guarantee full payment of that student's tuition. However, because there was nothing in the school's petition from which we could infer that payment would not be made, we determined that no justiciable controversy existed because it could not yet be determined whether the school would be fully reimbursed.

Petitioners claim that until an accounting is ordered, they simply do not have enough information to allege additional Act violations against Respondents.

■ Finally, Petitioners correctly note that health care providers are subject to Respondents' alleged violation of Act surcharge determination provisions every year. Thus, even if Respondents complied with the Act's provisions after 1991, because their alleged repeated violations during 1987–91 constitute a significant legal controversy that is capable of repetition yet has evaded review, the mootness doctrine need not bar this action. *Reichley v. North Penn School District,* 113 Pa.Commonwealth Ct. 528, 537 A.2d 391 (1988). For these reasons, we overrule the second preliminary objection.

## III.

In the third preliminary objection, Respondents argue that we should dismiss Petitioners' action because they failed to exhaust their available administrative remedies before seeking judicial review. *St. Clair v. Pennsylvania Board of Probation and Parole,* 89 Pa.Commonwealth Ct. 561, 493 A.2d 146 (1985). Respondents assert that there is an administrative review process for parties who, like Petitioners, challenge surcharge amounts.[13] However, Respondents maintain that Petitioners ignored this administrative remedy for each of the four years in question and, instead, now seek to resurrect issues long concluded, converting what should have been an objection to a single proposed surcharge into a challenge to four surcharge

13. Respondents note that the CAT Fund submits its proposed surcharge for the upcoming year in the fall of the current year, notice of which is published in the *Pennsylvania Bulletin* along with an invitation to interested parties to write comments, suggestions or objections within thirty (30) days of the publication date. This surcharge must be approved by the Commissioner and, once approved, takes effect on or after January 1 of each year. 40 P.S. § 1301.701(e)(1); 31 Pa.Code § 242.3(b). The Insurance Department's administrative action on the CAT Fund's proposed request is governed by the Commonwealth's Rules of Administrative Practice and Procedure, 1 Pa.Code §§ 31.1–35.251. Thus, according to Respondents, parties, like Petitioners, who oppose the proposed surcharge can object and file a Petition to Intervene in the administrative process. 1 Pa.Code §§ 35.23, 35.27, 35.28.

amounts which have already been collected and used, thereby increasing the Fund's exposure to liability.

It is axiomatic that the exhaustion doctrine applies only where an adequate administrative remedy exists. *St. Clair.* In spite of Respondents' claims to the contrary, Petitioners contend that health care providers have no real administrative remedy under the Act when they contest the propriety of Respondents' annual surcharge determination.[14] We must agree.

In *Ohio Casualty Group v. Argonaut Insurance Co.*, 514 Pa. 430, 525 A.2d 1195 (1987), our Supreme Court held that the CAT Fund could not assert an exhaustion of administrative remedies defense where the Act afforded no relevant remedy. *Ohio Casualty* involved an insurer that brought an original action in Commonwealth Court seeking restitution from the Fund for the insurer's payment of a malpractice claim allegedly owed by the Fund. The Fund filed preliminary objections based on the insurer's alleged failure to exhaust administrative remedies, contending that the insurer should have sought resolution through the Fund itself before seeking judicial review. Although recognizing the importance of pursuing statutorily prescribed remedies, the Court concluded that the Act offered no specific procedure through which the insurer could be afforded a remedy of restitution; thus, exhaustion would not be required because the administrative process could not provide the relief sought. *Id.* The Court reasoned that because the provisions of the Act were directed to resolving claims brought by injured patients against health care providers, the Act did not anticipate claims brought directly

---

14. Petitioners note that, unlike The Casualty and Surety Rate Regulatory Act, Act of June 11, 1947, P.L. 538, *as amended*, 40 P.S. §§ 1181–1199, the Act provides no hearing opportunity for a health care provider contesting the government's approved rate. Petitioners claim that without an opportunity for a hearing during the brief period between the surcharge notification and its January 1 effective date, health care providers have no means to determine whether the surcharge rate complies with the Act. Thus, their only recourse is to submit an objection, albeit without hope of a hearing, or submit to the proposed surcharge amount in order to retain their medical licenses. 40 P.S. § 1301.701(f).

against the Fund for failing to comply with its statutory duty. The Court determined that such claims place the Fund in the position of a defendant and, as a defendant, the Fund was in no position to assess its own liability; thus, recourse to an independent body, i.e. the courts, was necessary. The Court stated:

> Under the doctrine of exhaustion before a litigant can be denied access to the courts there must be a forum available in which he or she can participate. Nebulous claims of informal procedures or implied administrative powers are unavailing since it is clear that without a concrete procedural remedy the litigant could in no way achieve a resolution of his claim except by the grace of the party against whom he is proceeding.

*Id.* at 437, 525 A.2d at 1198.

■ Petitioners here are in much the same position as the insurer in *Ohio Casualty* in that they too seek relief based on Respondents' alleged noncompliance with the mandates of the Act. Moreover, although Respondents have suggested a course that Petitioners might have followed, it is inadequate with respect to the alleged injury sustained and relief requested. As in *Ohio Casualty,* where the Court determined that the Act afforded no procedure whereby an insurer could seek restitution for its discharge of an alleged statutory liability of the Fund, Petitioners here have no concrete statutorily prescribed procedure which they are required to follow when they feel that Respondents have overcharged them or otherwise mismanaged CAT Fund accounts. Because the Act affords Petitioners no remedy in the circumstances of their complaint, Respondents cannot successfully argue that Petitioners have failed to exhaust their administrative remedies. Therefore, we overrule the third preliminary objection.

## IV.

■ Fourth, Respondents contend that Petitioners' action should be barred by the equitable doctrine of laches, claiming that Petitioners' failure to exercise due diligence in instituting this action has prejudiced Respondents. Application of the

doctrine of laches depends upon both inexcusable delay and prejudice to the other party. *Richland Township Planning Commission v. Bobiak,* 122 Pa.Commonwealth Ct. 624, 552 A.2d 1143 (1989); *Del–Val Electrical Inspection Service, Inc. v. Stroudsburg–East Stroudsburg Zoning and Codes Office,* 100 Pa.Commonwealth Ct. 429, 515 A.2d 75 (1986). Respondents claim that both elements are readily apparent here.

As to the first element, Respondents note that although each of the Petitioners was separately assessed a CAT Fund surcharge in 1987, 1988, 1990 and 1991, none of them ever challenged these surcharges, nor have they alleged that they were prevented from doing so. In fact, Respondents contend that Petitioners offer no excuse for their inaction except to say that they were unaware of a problem until their review of this court's unpublished single-judge opinion led them to believe that the surcharges were improper. Moreover, without conceding that Petitioners could rely on it, Respondents contend that that opinion does not excuse Petitioners' failure to timely challenge the surcharges where the financial information supporting these surcharges was always available to them and was subject to administrative review on a yearly basis. Indeed, Respondents point out that from 1987 through the present, the CAT Fund submitted its proposed surcharge to the Insurance Commissioner for review in accordance with the Act, providing notice in the *Pennsylvania Bulletin* and soliciting objections. In short, Respondents contend that because Petitioners had every opportunity to challenge the surcharge in years past but failed to do so, their delay in bringing this action now must be deemed unreasonable.

Additionally, Respondents maintain that allowing Petitioners to proceed with their belated challenge to past surcharge assessments will prejudice the Fund by undermining its fiscal integrity. Respondents point out that the CAT Fund operates on a cash-in/cash-out basis, funded exclusively by its annual surcharge and, if necessary, an emergency surcharge. These surcharge monies are, by law, dedicated to paying claims made against health care providers and to paying the Fund's administrative expenses; the Fund is the sole source of mo-

nies to make these payments. 40 P.S. § 1301.701(e)(4). Respondents note that the surcharges have been collected for the years in question and the money disbursed, in accordance with the Act, to pay claims against the CAT Fund and to cover its expenses; no emergency surcharges were, nor have they ever been, assessed. According to Respondents, because the Fund does not set aside reserves for contingent liabilities nor allocate monies towards refunds or credits, an order that the Fund refund current surcharges or credit future surcharges to correct past overcharges would siphon monies away from their dedicated purpose. Indeed, Respondents assert that permitting Petitioners to pursue this action could open the door for similar claims from every Pennsylvania health care provider and so have enormous implications with regard to the Fund's continued viability.

On the other hand, Petitioners maintain that Respondents have not proved the elements of laches in a manner that is free from doubt.[15] Petitioners assert that they have been diligent in trying to develop the necessary information for their action and that Respondents have not been prejudiced in any way.

Here, Petitioners claim that they were without information regarding a possible action against Respondents because (1) the notices of the surcharge contained no financial information about the basis for that particular surcharge amount, (2) the CAT Fund's annual reports which contain information about paid claims, office expenses and surcharges collected, are not made public until months after the surcharge notification, and (3) these reports contain the Fund's opening and closing balances for a given year, but do not show the surcharge calculation process, which is dependent upon

---

**15.** In determining the factual question of laches in the context of preliminary objections, we must determine whether Respondents' proof of the elements of laches is clear on the face of the record. *In re Estate of Marushak*, 488 Pa. 607, 413 A.2d 649, 651 (1980). While laches may be raised by preliminary objection, the factual nature of the defense generally requires a hearing, and we can sustain the objection only where the issue is free from doubt. *Long v. Kistler*, 72 Pa.Commonwealth Ct. 547, 457 A.2d 591 (1983).

the figures for projected basic coverage premium (1% of which serves as the denominator of the fraction in the surcharge calculation equation) and projected office expenses (a component of the numerator of the fraction in the surcharge calculation equation). Therefore, Petitioners contend that a health care provider, even after receiving notice of the surcharge, is without sufficient information to evaluate that surcharge determination or question its compliance with the Act. Thus, only when Petitioners became aware, through the discovery of our unreported single-judge opinion, that they could determine an overcharge by reviewing this necessary financial data available only to Respondents, did they recognize a cause of action. From that time, Petitioners recount a more than year-long series of unavailing attempts to acquire the necessary financial information from the Fund, belying Respondents' assertion that information supporting the surcharges was always available to Petitioners and exhibiting Petitioners' diligence in pursuing this action.[16]

Additionally, Respondents have failed to meet their burden of proof with regard to prejudice. In order to

---

16. We derive guidance from our Supreme Court's opinion in *Pennsylvania Coal Mining Association v. Insurance Department*, 471 Pa. 437, 370 A.2d 685 (1977), which held that where companies are forced to purchase insurance coverage as a condition of doing business, they must have notice and a reasonable opportunity to present objections to the rates set. Petitioners here lacked this opportunity.

As in *Pennsylvania Coal Mining*, a health care provider's participation in the CAT Fund and compliance with the Act provisions are required by statute; health care providers must pay the surcharge or face suspension of their medical licenses, 40 P.S. § 1301.701(f). Here, although Petitioners received notice of the proposed surcharge, along with an invitation to voice comments or objections, they were without information on which to base any objections. Moreover, there was no provision requiring a hearing on the matter, either in the short span of time between notification and approval, or after the surcharge amount was levied. Thus, after receiving the surcharge determination, Petitioners had limited options. They could (1) object to the surcharge without knowing whether or why the determination was in error, hoping to acquire the appropriate documents for a brief inspection of possible grounds for objection without a hearing, or (2) pay the surcharge fee and protect their medical licenses from the Act's suspension provision. In short, Petitioners had no reasonable opportunity to object to the surcharge amount levied by Respondents.

raise the defense of laches, a party must establish prejudice resulting from some changed condition of the parties which occurs during the period of, *and in reliance on,* the delay. *Sprague v. Casey,* 520 Pa. 38, 550 A.2d 184 (1988). The required prejudice may be established where, for example, records have become lost or unavailable, witnesses die or cannot be located and where the party asserting laches has *changed its position in anticipation that a party will not pursue a particular claim. Richland Township Planning Commission; Del–Val Electrical.*

■ Here, Respondents claim that they are prejudiced by Petitioners' delay in that all the monies in the Fund are allocated and they have not set aside reserves to cover contingent liabilities. However, although Respondents have utilized the surcharge monies collected during the years in question and have no reserves set aside for the payment of refunds or credits, they did not use the surcharge monies nor refrain from setting aside funds for contingent liabilities in reliance on Petitioners' lack of action. Indeed, although we do not rely on that opinion, we would note that following the single-judge unpublished decision of this court in late 1988, Respondents could have anticipated that an action like Petitioners would be forthcoming if Respondents continued in their alleged violation of the Act. Thus, we do not consider the reasons provided by Respondents sufficient to establish prejudice to Respondents and conclude that the doctrine of laches does not bar Petitioners from seeking relief. Therefore, we overrule the fourth preliminary objection.

## V.

Finally, to the extent that this court would address the merits of Petitioners' claim, Respondents contend that we should dismiss Petitioners' Petition for failure to state a claim for which relief can be granted because, in fact, Respondents' calculation of the annual surcharge accords completely with the Act. Respondents claim that the language of section 701(e)(1) of the Act, 40 P.S. § 1301.701(e)(1), does not, by its

terms, cap the Fund's closing balance at $15,000,000. Indeed, according to Respondents, the legislative history indicates that this amount is a floor, not a ceiling. Respondents argue that although intended as a cap when the Act was originally enacted,[17] the General Assembly officially amended section 701 of the Act in 1980, eliminating the $15,000,000 limit as actuarially unsound because it would prove inadequate to cover potential claims, and so would subject health care providers to the risk of extremely large surcharges to cover these deficits.[18]

Relying on principles of statutory construction, Respondents contend that the only reasonable interpretation of the 1980 amendment is that the legislature intended to eliminate the $15,000,000 cap and surcharge reduction requirement, reasoning that where, as here, language is deleted from a statute, the deletion renders the original language inoperative and indicates a different legislative intent.[19] *Deremer v. Workmen's*

17. As originally enacted in 1975, section 701 of the Act did impose a $15,000,000 limit on the Fund's closing balance by specifically requiring that any monies in excess of this amount be applied to reduce the surcharge for the upcoming year. The Act also made provision for any shortfall in the Fund's closing balance. The original Act provided that:
    ... If the total Fund exceeds the sum of $15,000,000 at the end of any calendar year after the payment of all claims and expenses, including the expenses of operation of the office of the director, the director shall reduce the surcharge provided in this section in order to maintain the fund at an approximate level of $15,000,000.... If the fund would be exhausted by the payment in full of all claims allowed during any calendar year, then the amount paid to each claimant shall be prorated. Any amounts due and unpaid shall be paid in the following calendar year.
    40 P.S. § 1301.701(d). Both of these provisions were amended in 1980; the surcharge reduction requirement was deleted and the pro rata allocation for shortfalls was replaced with the emergency surcharge provision, 40 P.S. § 1301.701(e)(3).

18. This was the determination of the six-member committee which the General Assembly appointed to advise it regarding necessary amendments to the Act. (Committee Report at 4–6; Exhibit B of Respondents' brief.)

19. Additionally, Respondents again note that Petitioners have paid no more to the Fund than that which they actually owed. Pointing to the Act's legislative history and the practical realities of the Fund's operations, Respondents claim that Petitioners' surcharge payments in accordance with the $15,000,000 floor—what the Petitioners' have labelled as "surcharge overcharges"—has actually saved Petitioners from pay-

*Compensation Appeal Board,* 61 Pa.Commonwealth Ct. 415, 433 A.2d 926 (1981). *See also Masland v. Bachman,* 473 Pa. 280, 374 A.2d 517 (1977).

We note that at the procedural stage of a demurrer, Petitioners are under no burden to prove their cause of action. *Marinari v. Department of Environmental Resources,* 129 Pa.Commonwealth Ct. 569, 566 A.2d 385 (1989). We must determine only whether the facts in the Petition are sufficient to entitle it to relief. *Id.* Here, we cannot say with certainty that Petitioners have pleaded facts insufficient to establish a right to the relief sought.

In Count I, Petitioners seek an order directing Respondents to recompute the surcharges to reflect a $15,000,000 statutory cap, crediting Petitioners for any excess surcharge fees paid.[20] We acknowledge the fact that the General Assem-

ing additional monies to the Fund in the form of increased annual surcharges or emergency surcharges and, because Petitioners have paid only what they owed, they are not entitled to recover any money through this action.

Although Respondents claim that Petitioners have paid no more into the fund than that which they owed, Petitioners point out that without an accounting, there is no way for them to verify that statement. Moreover, we would point out that even if Director is correct and Petitioners would have paid these amounts *in some form,* that does nothing to extinguish the parties' controversy over whether Respondents have properly performed the surcharge determination procedures mandated by the Act. Again, we point out that Respondents' argument actually defeats their contention that the Fund might face fiscal ruin if Petitioners succeed in their claim. If, as Respondents contend, Petitioners would have paid this same amount of money, albeit in the form of increased annual surcharges or emergency surcharges rather than the surcharge amounts actually levied against them, the Fund will not have to reimburse or credit Petitioners for overpayments; instead, they will merely have to relabel the payments so that they will appear in the proper form. However, this cannot be accomplished without an accounting.

20. In Count I, Petitioners also sought to enjoin the collection and use of 1993 surcharge fees. However, we note that the 1993 surcharge was effective January 1, 1993 and was collected during that year. Further, claims settled through August 31, 1993 will have been paid on December 31, 1993. Thus, Petitioners cannot receive the injunctive relief they seek in Count I of the Petition. However, with regard to any past overcharges, Petitioners still could get relief through an order directing

bly has deleted language from the Act which would have supported Petitioners' interpretation; nevertheless, even in its current version, one could view section 701(e)(1) of the Act as imposing a $15,000,000 statutory cap on the CAT Fund's year-end balance. Petitioners here claim that by ignoring this statutorily imposed limit, Respondents miscalculated the annual surcharge to the detriment of Pennsylvania's health care providers. Whether such overcharges were levied against Petitioners in violation of the Act is clearly an issue which, if proven, would allow Petitioners the relief requested in their Petition. Because we conclude that the law is uncertain as to a possible recovery by Petitioners if the facts are as pleaded, we must overrule Respondents' preliminary objection in the nature of a demurrer to Count I of the Petition.

█ With regard to Count II, Petitioners contend that their Petition has set out cognizable claims for Rule 1530 accounting relief based upon Respondents' fiduciary relationship over the CAT Fund accounts.[21] Petitioners assert that because the language of the Act requires that Respondents hold the CAT Fund and its income *in trust,* 40 P.S. § 1301.701(e)(2), Respondents have the duties of a fiduciary to Petitioners and other health care providers when handling CAT Fund matters such as determining surcharge amounts, investment decisions and emergency surcharge levies.[22]

Respondents to recompute Petitioners' past surcharges and credit them for any excess amounts paid.

21. An equitable accounting is proper where there is a fiduciary relationship between the parties, where misrepresentation of the correct amount due is charged, where accounts are mutual or complicated, or when discovery is needed and material to relief, and where the plaintiff does not have an adequate legal remedy. *Setlock v. Sutila,* 444 Pa. 552, 282 A.2d 380 (1971); *Ebbert v. Plymouth Oil Co.,* 348 Pa. 129, 34 A.2d 493 (1943); *Buczek v. First National Bank of Mifflintown,* 366 Pa.Superior Ct. 551, 531 A.2d 1122 (1987).

22. Petitioners note that under section 1 of the Uniform Fiduciaries Act, Act of May 31, 1923, P.L. 468, *as amended,* 7 Pa.C.S. § 6351, the definition of fiduciary "includes a trustee, under any trust expressed, implied, resulting or constructive." Fiduciaries can include a "public officer, ... or any other person acting in a fiduciary capacity for any person, trust or estate."

Moreover, Petitioners contend that even if Respondents simply have a fiduciary type relationship with Petitioners, they are still entitled to an equitable accounting. Petitioners point out that in *Local No. 163, International Union of United Brewery, etc. v. Watkins*, 417 Pa. 120, 207 A.2d 776, 781 (1965), our Supreme Court held that a labor union could seek accounting relief because plaintiff union sufficiently alleged a fiduciary type relationship with its former officers. The union sought an accounting to determine the reason for unexplained losses of union funds. The Court noted that federal labor law imposed a fiduciary type responsibility on officers and agents of labor organizations because those officials occupied posi-

According to the Act, "[t]he fund and all income from the fund *shall be held in trust*, deposited in a segregated account, invested and reinvested by the director, and shall not become a part of the General Fund of the Commonwealth." 40 P.S. § 1301.701(e)(2) (emphasis added). The Act also grants Director the authority to "issue rules and regulations consistent with [the Act] regarding the establishment and operation of the fund including ... the levying, payment and collection of the surcharges." 40 P.S. § 1301.701(e)(4). Thus, Petitioners reason that Respondent Director is a fiduciary for the CAT Fund and its income.

Moreover, under 40 P.S. § 1301.701(e)(1), the Commissioner has prior approval over the CAT Fund surcharge determination, which, along with investment income and any emergency surcharge, constitutes the Fund's sole and exclusive source of funding, 40 P.S. § 1301.701(e)(4). The latter section also authorizes the Commissioner to issue "rules and regulations regarding the imposition of the emergency surcharge." Thus, Petitioners claim that the Commissioner also has a fiduciary duty toward the CAT Fund and its income.

We note that any fiduciary relationship existing between Petitioners and Respondents is not defeated by our decision in *Finkbiner v. Medical Professional Liability Catastrophe Loss Fund*, 119 Pa.Commonwealth Ct. 243, 546 A.2d 1327 (1988), *aff'd per curiam*, 523 Pa. 101, 565 A.2d 157 (1989). In *Finkbiner*, we held that the CAT Fund owed no fiduciary duty to a physician with regard to the handling of a malpractice claim made against him by a patient. We reasoned that there was no contractual relationship between the doctor and the Fund; rather, the Fund had only the *discretionary* power to defend, litigate, settle or compromise claims made against the doctor which were payable by the Fund. 40 P.S. § 1301.702(f). This holding has no bearing on whether the Respondents have a fiduciary duty to properly manage the CAT Fund and its income. Here, unlike the situation in *Finkbiner*, Respondents have no discretion; instead, the Act mandates that the Fund's Director hold the Fund and its income in trust and requires Respondents, as trustees, to follow a prescribed procedure in the levying and collection of surcharges.

tions of trust in relation to the organization and its members. Further, the Court recognized that as a matter of common law, officers and agents of such organizations should be held to standards of good faith. Accordingly, the Court determined that where facts pleaded in the complaint sufficiently alleged a breach of the officer's relationship with the union, a request for an accounting was supported. *Id.*

■ Here, Petitioners contend that the Act imposes fiduciary responsibilities on Respondents similar to the federal duty imposed on labor union officials which was recognized in *Watkins.* Moreover, because the Act requires Petitioners to turn over the general business of their excess medical malpractice coverage to a state agency, Petitioners must be able to repose trust in Respondents, thereby requiring Respondents to return that trust by acting in good faith.[23] Petitioners allege in their Petition that they may have overpaid sums to the Fund because Respondents breached their Act surcharge determination duties. (Petition at ¶¶ 28–31.) Therefore, Petitioners, through the allegation of Respondents' violations of the Act surcharge provisions, state a worthy Rule 1530 accounting claim for equitable relief, and we overrule Respondents' preliminary objection to this claim.

Finally, we address the Commissioner's separate ground for dismissal of the Petition on grounds that it fails to state a claim against the Commissioner for which relief could be granted. Referring to Petitioners' request that Respondents be enjoined from both collecting or using the 1993 surcharge fees, the Commissioner claims that because she has no author-

___

**23.** Black's Law Dictionary 564 (5th ed. 1979) includes the following in its definition of "fiduciary relation":

An expression including both technical fiduciary relations and those informal relations which exist wherever one man trusts and relies upon another. It exists where there is special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence. A relation subsisting between two persons in regard to a business, contract, or piece of property, or in regard to the general business or estate of one of them, of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith.

ity to do either, this relief cannot apply to her.[24] As to Petitioners' request to recompute past surcharges, the Commissioner notes that the Director determines the surcharge subject to prior approval by the Commissioner, 40 P.S. § 1301.701(e)(1), and because there is currently no filing before the Commissioner requesting a reduction of the surcharge fees, she has no ability to act in the manner sought by Petitioners even if Petitioners were granted the relief they seek. The Commissioner asserts that because Petitioners cite no cognizable legal theory which gives rise to any liability on the part of Commissioner and seek no redress from the Commissioner which this court could properly order under applicable law or regulation, the case against her must be dismissed. We disagree.

█ We note that the Commissioner's objections are all directed toward Count I of Petitioners' complaint. We have already stated that Petitioners cannot receive the injunctive relief they seek in that Count of their complaint. With regard to Petitioners' request to recompute their surcharges for 1987–91 and credit them for any overcharges, this request is based on allegations that both the Director and the Commissioner violated Act provisions; i.e., that the Director proposed and the Commissioner approved surcharge amounts in excess of those permitted under the mandated procedures of the Act. Therefore, if Petitioners succeed in their action, any order providing full relief to Petitioners must be directed to both Respondents. Moreover, in Count II of their Petition, Petitioners state a proper claim for an accounting by alleging that both the Director and the Commissioner breached their fiduciary duty to Petitioners. Therefore, we overrule the Commissioner's separate preliminary objection to the Petition.

Accordingly, we dismiss all of Respondents' preliminary objections and direct Respondents to file an answer to Petitioners' Petition.

---

**24.** She argues that it is not the Commissioner, but the Director who is authorized by the Act to "issue rules and regulations regarding the establishment and operation of the Fund including all procedures and the levying, payment and collection of the surcharges...." 40 P.S. § 1301.701(e)(4).

## ORDER

AND NOW, this 16th day of September, 1994, we dismiss all Respondents' preliminary objections and direct Respondents to file an answer to Petitioners' Amended Petition for Review in the Nature of a Complaint in Equity.