### The MILTON S. HERSHEY MEDICAL CENTER OF the PENNSYLVANIA STATE UNIVERSITY, Plaintiff,

v.

### COMMONWEALTH of Pennsylvania et al., Defendants.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2001.

Decided Nov. 27, 2001.

11.  53 P.S. § 881.104(11).

John A. Snyder, State College, for plaintiff.

Elit R. Felix, II, Philadelphia, for defendants.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, SMITH, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge and LEADBETTER, Judge.

McGINLEY, Judge.

Before this Court, in our original jurisdiction, is the motion for judgment on the pleadings filed by the Milton S. Hershey Medical Center of the Pennsylvania State University (HMC) and the cross-application of the Pennsylvania Medical Professional Liability Catastrophe Loss Fund (CAT Fund) for summary relief.

## History

■ The history, as recounted in *Milton S. Hershey Medical Center v. CAT Fund*, 763 A.2d 945 (Pa.Cmwlth.2000), is as follows:

> This matter stems from two alleged incidents of medical malpractice.[1] The first incident concerns allegations of obstetrical malpractice whereby HMC and several of its physicians were named as defendants in a July 1996, complaint filed in the Court of Common Pleas of Dauphin County. The conduct occurred in January 1995 and involved allegations of inappropriate care rendered to the plaintiff mother that caused injuries to her plaintiff child.
>
> Under the Health Care Services Malpractice Act[2] (Act 111), HMC was required to provide $200,000.00 of basic insurance to its providers, while the CAT Fund provided excess insurance of $1,000,000.00 per provider.[3] As the controversy proceeded, the attending OB/Gyn physician and HMC became the only remaining defendants. The physi-

cian was undisputedly the agent of HMC and HMC was vicariously liable. The CAT Fund authorized a $1.2 million settlement offer to the plaintiffs.

> HMC tendered $400,000.00 on behalf of itself and the physician. The CAT Fund provided $1,000,000.00. The physician had excess coverage for the loss above $4,000,000.00. Therefore, HMC was uninsured for the $2.8 million beyond the first $1.2 million of insurance provided by the basic and excess coverage. The CAT Fund did not contribute toward settlement on behalf of HMC in light of HMC's vicarious liability and because all private excess coverage was not exhausted. As a result of the CAT Fund's refusal, HMC was required to pay the disputed amount to effectuate the settlement.
>
> In April 1997, a second medical malpractice complaint was filed in the Court of Common Pleas of Dauphin County, this time against a pediatric cardiologist and HMC for alleged negligence occurring in September 1995 when a procedure was performed on the plaintiff's minor son. Here, the settlement value was in excess of $2.4 million. The CAT Fund again refused to contribute toward settlement on behalf of HMC because HMC was vicariously liable. Thus, HMC was forced to pay beyond the basic coverage in order to avoid prohibitive verdicts and delay damages.
>
> On December 13, 1999, HMC filed a complaint[4] in this Court challenging the

1. To settle medical malpractice claims against HMC or its physicians, four "layers" of insurance coverage were available: 1) basic, 2) CAT Fund excess, 3) uninsured exposure, and 4) private excess. *See* Complaint, paragraph 4, at 2.

2. Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.101–1301.1006.

3. "A primary purpose in establishing the CAT Fund was to assure the availability of reason-

ably priced professional liability insurance for all Pennsylvania health care providers and to insure that persons injured as a result of medical malpractice may obtain prompt adjudication of their claims and receive compensation for those claims." *Meier v. Maleski,* 167 Pa.Cmwlth. 458, 648 A.2d 595, 598 n. 3 (1994) *citing* 40 P.S. § 1301.102.

4. Pursuant to Pa.R.A.P. 1502, "[t]he petition for review ... shall be the exclusive procedure for judicial review of a determination of

CAT Fund's policy that it is not obligated to contribute to settlement for HMC's vicarious liability until all layers of insurance available to the liable defendants are exhausted. HMC asserted in its complaint the following eight counts:

Count I—Declaratory Relief

Count II—Violation of Act 111

Count III—Indemnification

Count IV—Subrogation

Count V—Estoppel

Count VI—Quasi Contract

Count VII—Denial of Due Process and Equal Protection Rights

Count VIII—Bad Faith.

Throughout the complaint, HMC reiterates that it seeks "damages ... to compensate HMC for the CAT Fund's wrongful refusal to participate in the settlements of the Obstetrical Malpractice Action and the Pediatric Cardiology Action...." Additionally, HMC requests that this Court "enter a declaratory judgment that the CAT Fund may not, under ... Act 111 ... subordinate the priority of payment of vicarious liability claims." *See* Complaint at 23–24. On January 24, 2000, the CAT Fund filed preliminary objections alleging that HMC failed to state a cause of action

against the CAT Fund in Counts II through VIII due to legal insufficiency of the pleading.

*Hershey Medical Center,* 763 A.2d at 947–948 (footnote omitted and footnotes added).

By opinion and order dated November 21, 2000, this Court dismissed all preliminary objections.[5] In December 2000, the CAT Fund filed an answer and new matter.[6] In January 2001, HMC filed a reply to new matter.[7]

### HMC's Motion for Judgment on the Pleadings

In March 2001, HMC filed a motion for judgment on the pleadings. HMC alleged that this Court's ruling on the preliminary objections resolved the issue of prioritizing payments under Act 111. Thus, HMC contends that it is entitled to judgment on counts I to IV and VI because the CAT Fund may not subordinate payment as to vicarious liability until coverage on direct liability is exhausted.[8] HMC requested judgment in the amount of $1,600,000.00, which represents HMC's payments that were allegedly the CAT Fund's legal obligations.

---

a government unit." Therefore, HMC's complaint should be entitled "petition for review."

**5.** On review of preliminary objections, "[W]e must accept as true all well-pleaded material allegations in the petition for review as well as all inferences reasonably deduced therefrom...." In order to sustain preliminary objections, it must appear with certainty that the law will not permit recovery.... *Meier,* 648 A.2d at 600 (citations omitted).

**6.** The CAT Fund alleged that it "need not contribute toward settlement on behalf of a vicariously liable health care provider until all available coverage on the directly liable health care provider is exhausted." Answer

and New Matter, December 21, 2000, at 33–34.

**7.** HMC alleged "it is the language of the statute and the common law which controls the fact that the Fund may not subordinate payment for vicarious claims." Reply to New Matter, January 10, 2001, at 3. HMC also alleged that "the law ... does not countenance the distinctions between direct and vicarious liability...." Reply to New Matter at 3.

**8.** With regard to counts V, VII, and VIII, HMC acknowledges that questions of fact prevail. Nevertheless, the disposition of count I, for declaratory judgment, disposes of this controversy.

## CAT Fund's Application for Summary Relief

■ In April 2001, the CAT Fund filed an application for summary relief. The CAT Fund framed the issue regarding priority of coverage, i.e. "whether the Fund properly declined to contribute toward settlement on behalf of a solely vicariously liable hospital until all available coverage on its directly liable physician employee is exhausted." Application for Summary Relief, April 12, 2001, paragraph 10, at 4.[9] The CAT Fund maintains it acted in accordance with basic insurance and vicarious liability [10] principles.[11]

Pa.R.A.P. 1532(b) provides that "[a]t any time after the filing of a petition for review in an appellate or original matter the court may on application enter judgment if the right of the applicant thereto is clear." When questions of fact are disputed, summary relief is not warranted. As long as the dispute is a legal one, as opposed to a factual dispute, we are not required to deny summary relief. *Main Line Health, Inc. v. CAT Fund,* 738 A.2d 66, 68 n. 5 (Pa.Cmwlth.1999).[12]

9. The CAT Fund alleged that "[i]f the Fund prevails on the dispositive legal issue ...,none of the alternative theories of recovery on the dispositive issue contained in HMC's Complaint is viable." Application for Summary Relief, paragraph 12, at 4.

10. Concerning the doctrine of vicarious liability, the CAT Fund alleged that:
   [I]f the directly liable party is unavailable or lacks the ability to pay, the victim has recourse against the vicariously liable party. If the directly liable party is available or has the means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.
   Application for Summary Relief, paragraph 14, at 4.

11. In June 2001, this Court entered an order granting the application for stay of discovery.

■ Statutory interpretation is pivotal to the outcome of this controversy. Section 705(a) of Act 111 provides in pertinent part:

No insurer providing excess professional liability insurance to any health care provider eligible for coverage under the fund shall be liable for payment of any claim against a health care provider for any loss or damages except those in *excess of the fund coverage limits.* (Emphasis added).

40 P.S. § 1301.705(a).

Section 701(d) of Act 111 indicates:

There is hereby created a contingency fund for the *purpose* of paying all awards, judgments and settlements for loss or damages against a health care provider ... as a consequence of any claim for professional liability brought against such health care provider as a defendant ... to the extent such health care provider's share *exceeds its basic coverage* insurance in effect at the time of occurrence.... The *limit of liability* of the fund shall be as follows:

12. In *Riccio v. American Republic Insurance Company,* 550 Pa. 254, 705 A.2d 422 (1997), our Pennsylvania Supreme Court indicated:
   Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings ..., a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or the law clearly warrant a new look at the question.
   *Id.* at 261, 705 A.2d at 425 *quoting Goldey v. Trustees of the University of Pennsylvania,* 544 Pa. 150, 155–56, 675 A.2d 264, 267 (1996). Here, our circumstances have changed at a later stage of the litigation, and we are not bound by our earlier opinion.

(1) For calendar years 1997 through 1998, the limit of liability of the fund shall be $900,000 for each occurrence for each health care provider and $2,700,000 per annual aggregate for each health care provider.

.... (Emphasis added).

40 P.S. § 1301.701(d).

Act 111, via section 705(a) and 701(d), specifically sets forth the payment obligations of basic coverage insurers, the CAT Fund, and excess carriers. Together, these comprise the "layers" of coverage.[13] According to the CAT Fund, HMC made a business decision to structure its private excess insurance program with a self-insured retention layer of $3 million followed by a private excess layer of $25 million. HMC's payment from the $3 million self-insured retention layer on behalf of the directly liable physicians is at the core of this dispute. HMC contends that it was not obligated to pay from the self-insured layer until the CAT Fund's limits of liability were reached on both columns.

Our earlier opinion addressed the CAT Fund's preliminary objections to counts II through VIII of HMC's complaint/petition for review. It must be emphasized that the CAT Fund did not preliminarily object to count I seeking declaratory relief. Therefore, this is our first opportunity to consider the declaration of whether or not the CAT Fund may subordinate the payment of vicarious liability claims.

In its complaint/petition for review, HMC alleged that "[t]he instant dispute involves HMC's challenge to a recently asserted policy by the CAT Fund that it can subordinate or refuse to contribute toward settlements on behalf of HMC for HMC's perceived vicarious liability until such time as all layers of insurance available to the directly liable defendants are exhausted." Complaint, December 15, 1999, paragraph 3, at 1.

The CAT Fund responded:

3. Denied as stated. The instant dispute involves the Fund's position that all available coverage on a directly liable health care provider must be exhausted

13. In its application for summary relief, the CAT Fund illustrated the following columns of coverage for the HMC physician and HMC:

| Private Excess Layer of $25 Million | Private Excess Layer of $25 Million |
| --- | --- |
| Self–Insured Retention Layer of $3 Million | Self–Insured Retention Layer of $3 Million |
| Fund Limit of Liability Layer of $1 Million | Fund Limit of Liability Layer of $1 Million |
| Basic Insurance Coverage Layer of $200,000 | Basic Insurance Coverage Layer of $200,000 |
| **HMC Physician** | **HMC** |

Application for Summary Relief, paragraph 8, at 3.

before the Fund will contribute toward settlement on behalf of a health care provider who is solely vicariously liable. Stating further, the Fund denies The Milton S. Hershey Medical Center of the Pennsylvania State University's ("HMC") characterization of "perceived vicarious liability." As HMC concedes in paragraph 75 of this complaint, its liability for the disputed settlement proceeds in the Pediatric Cardiology Action and the Obstetrical Malpractice Action was vicarious only, and that fact is therefore undisputed for purposes of this action. The Fund further denies that the basis of the Fund's practice is mere perception. *The Fund's sound practice to contribute toward settlement on behalf of a solely vicariously liable health care provider only when all available coverage on the directly liable health care provider is exhausted is not based upon the perception of the hospital's liability as vicarious but rather upon the practical reality of the actual claims at issue, and is consistent with the application of basic insurance principles, and common law indemnification and vicarious liability principles applied within the context of the Act.* The Fund further denies that its practice with regard to vicarious liability claims is recently asserted. The Fund's position is and always has been that all available coverage on a directly liable health care provider must be exhausted before the Fund will contribute toward settlement on behalf of a health care provider who is solely vicariously liable. Stating further, the Fund has contributed toward settlement of vicarious liability claims in the past, present, and will do so in the future. However, the Fund does not contribute toward settlement of vicarious liability claims until all available coverage on the directly liable party is exhausted.

Answer and New Matter, paragraph 3, at 2 (emphasis added).[14] The CAT Fund's answer persuasively highlights basic insurance and vicarious liability principles which support the CAT Fund's position that all available coverage on directly liable physicians must be exhausted before coverage on vicariously liable HMC is implicated.

Basic insurance principles are demonstrated by use of the columns of coverage reflected in footnote number 13. On the HMC physician column, one ascends the chart paying toward settlement from each successive layer. When all layers of coverage for the directly liable physician are exhausted, then there is a shift to the vicariously liable HMC column to obtain the balance of the amount needed for set-

---

**14.** Additionally, HMC alleged that "[b]ecause of the substantial amount of private, excess coverage purchased by HMC which would be available to certain directly liable defendants, the CAT Fund's policy is tantamount to a denial of coverage for vicarious claims." Complaint, paragraph 6, at 2.

The CAT Fund denied this allegation stating:

> The Fund does not deny coverage for vicarious claims. The Fund has contributed and continues to contribute toward settlement of vicarious claims, but only when all available coverage on the directly liable physician is exhausted. In this case, the directly liable physician had pri-

vate excess insurance coverage that had not been exhausted, over and above his Fund coverage. So, although HMC had coverage for vicarious claims, that coverage had not been implicated because the private excess coverage on the directly liable physician had not been exhausted. *The issue in this case is the priority of coverage.* The private excess coverage on the directly liable physician is implicated before the basic coverage insurance and the Fund coverage on the vicariously liable hospital is implicated. (Emphasis added).

Answer and New Matter, paragraph 6, at 3.

tlement. The CAT Fund's theory is that the physician is primarily liable for the alleged malpractice while HMC's liability is secondary. Thus, the goal is to accomplish settlement from the directly liable physician's column of coverage, if possible.

■ The common law principle of vicarious liability supports the CAT Fund's approach particularly when applied within the context of Section 705(a) of Act 111. "[V]icarious liability imposes liability on a person by virtue of his relation to the tortfeasor, whereas joint liability is imposed on a person by virtue of actions taken in concert with another tortfeasor." *Crowell v. City of Philadelphia*, 531 Pa. 400, 409, 613 A.2d 1178, 1182 (1992) (footnote omitted).

In *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989), our Pennsylvania Supreme Court referred to the Pennsylvania Superior Court's explanation:

> The rules of vicarious liability respond to a specific need in the law of torts: how to fully compensate an injury caused by the act of a single tortfeasor. Upon a showing of agency, vicarious liability increases the likelihood that an injury will be compensated, by providing two funds from which a plaintiff may recover. If the ultimately responsible agent is unavailable or lacks the ability to pay, the innocent victim has recourse against the principal. If the agent is available or has means to pay, invocation of the doctrine is unnecessary because the injured party has a fund from which to recover.

*Id.* at 220, 560 A.2d at 1383 *quoting Mamalis*, 364 Pa.Super. 360, 528 A.2d 198, 200–01 (1987).

■ Here, HMC, as the vicariously liable party, was derivatively liable while the physician, the directly liable party, was the single tortfeasor in each malpractice cause of action. HMC and its physicians were not joint tortfeasors. Furthermore, each settlement could be satisfied from the physician's column of coverage, and there was no need to shift to HMC's column.[15]

■ It is generally accepted that judicial deference is given to an agency's statutory interpretation. *Nationwide Mutual Insurance Co. v. Foster*, 143 Pa.Cmwlth. 433, 599 A.2d 267 (1991). Moreover, "where the statutory scheme is complex a reviewing court must be even more cautious in substituting its discretion for the expertise of the administrative agency." *Id.* at 270 *citing SmithKline Beckman Corporation v. Commonwealth*, 85 Pa. Cmwlth. 437, 482 A.2d 1344, 1353 (1984). Here, the CAT Fund properly applied the concept of vicarious liability to construe Section 705(a) of Act 111, 40 P.S. § 1301.705(a).

According to the CAT Fund, its approach to priority of coverage comports with the fundamental reason the CAT Fund was created. Pursuant to Section 102 of Act 111:

> It is the purpose of this act *to make available professional liability insurance at a reasonable cost*, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim . . . . (Emphasis added).

40 P.S. § 1301.102.

With respect to legislative history, this Court conveyed:

---

**15.** Although HMC's approach to shift between the columns avoids its payment from the self-insured retention layer on behalf of the direct-ly liable physician, such an approach disregards the principle of vicarious liability.

In 1974, jurisdictions throughout the United States were confronted with what was popularly referred to as a "medical malpractice crisis" evidenced by precipitous increases in malpractice claims and awards, concurrent and equally precipitous increases in the cost of malpractice insurance and the threatened unavailability of such insurance at any cost. The Pennsylvania General Assembly responded to this "crisis" by enacting the Act. Its stated purpose is "to make available professional liability insurance at a reasonable cost, and to establish a system through which a person who has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim...." It implements this policy by establishing an arbitration system whereby claims against health care providers are initially heard and by limiting the dollar amount of liability of insurers on individual awards. This limitation on liability is achieved by the creation of a "Medical Professional Liability Catastrophe Loss Fund" ... established by a surcharge on insurance premiums or direct assessment by self-insurers.

*McCoy v. Board of Medical Education and Licensure,* 37 Pa.Cmwlth. 530, 391 A.2d 723, 725–26 (1978) (footnotes omitted).

HMC's approach would require the CAT Fund to pay simultaneously for directly liable and vicariously liable health care providers which in turn would enable HMC to either avoid payment or pay less from its self-insured retention layer. This benefit to HMC would be at the expense of the other health care providers throughout the Commonwealth. Any increase in the CAT Fund's payouts trigger an increase in the CAT Fund surcharge, thereby driving up the cost of basic CAT Fund medical malpractice coverage. On the other hand, the CAT Fund's approach adheres to HMC's structured private excess insurance program and furthers the availability of affordable coverage, a critical factor to the health care industry.[16]

### Conclusion

Accordingly, HMC's motion for judgment on the pleadings is denied, and the CAT Fund's application for summary relief is granted.

### ORDER

AND NOW, this 27th day of November, 2001, the motion for judgment on the pleadings filed by the Milton S. Hershey Medical Center of the Pennsylvania State University is denied, and the application of the Pennsylvania Medical Professional Liability Catastrophe Loss Fund for summary relief is granted.

---

**16.** In light of the foregoing analysis in favor of the CAT Fund's approach to priority of coverage, this Court need not address HMC's alternate theories of recovery.