Larry MEGGETT, Petitioner

v.

**PENNSYLVANIA DEPT. OF CORRECTIONS & Pennsylvania Board of Probation and Parole, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 12, 2005.
Decided Feb. 13, 2006.
As Amended Apr. 24, 2006.

Larry Meggett, petitioner, pro se.

Nicole L. Adams, Asst. Counsel and Michael A. Farnan, Chief Counsel, Camp Hill, for respondent, Pennsylvania Department of Corrections.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Before this Court are cross-motions for summary relief. Larry Meggett, an inmate in the custody of the Pennsylvania Department of Corrections (Department),[1] seeks a judgment that the Department's regulation of the length and styling of an inmate's hair violates his right to freedom of religion and to equal protection of the laws, as guaranteed by the Constitutions of the United States and the Commonwealth of Pennsylvania. For its part, the Department seeks a judgment that its hair style policy advances a valid penological interest that outweighs Meggett's right to freedom of religion, assuming, *arguendo*, that Meggett can convince this Court that the wearing of dreadlocks is a tenet of his religion. With respect to Meggett's equal protection claim, the Department contends that its hair length policy establishes categories by hair texture, not by race, and easily passes constitutional muster.

## BACKGROUND

Meggett, *pro se*, instituted his civil rights action with a petition for review addressed to our original jurisdiction. The petition was prompted by the Department's demand that Meggett cut his hair when, in August 2002, he entered the State Corrections Institution at Mahanoy (SCI–Mahanoy). Department Policy DC–ADM 807, issued December 15, 2003, establishes inmate grooming standards, limiting, *inter alia*, "Afro styles" to four inches in length.[2] Meggett, a professed Hebrew Israelite,[3] prefers to wear his hair in dreadlocks that far exceed the four-inch limit. On two occasions he applied to the facility's chaplain for a religious exemption from the prison hairstyle policy,[4] but these

---

1. The Pennsylvania Board of Probation and Parole was dismissed from this action by order dated March 5, 2004, sustaining the Board's preliminary objection in the nature of a demurrer.

2. The policy provides, in pertinent part, as follows:
 A. Hairstyles
 1. General
 Hairstyles of different types will be permitted provided they do not conflict with the facility's procedures for safety, security, identification, and sanitation efforts.
 2. Male Hairstyles
 a. Hair that does not fall below the top of the collar in length (Afro styles no longer than four inches) shall be permitted.
 * * *

d. An inmate request for a hairstyle exemption based in religion shall be in accordance with Department policy DC–ADM 819, "Religious Activities."
Policy DC–ADM 807.

3. Meggett's petition asserted that he had taken the Nazarene vow, which purportedly forbids cutting hair during the period of the vow. In his motion for summary relief, however, Meggett concedes that the vow is voluntary and that he has no knowledge of the Nazarenes. As a result, we will address Meggett's motion with reference only to the Hebrew Israelite faith.

4. Department Policy, DC–ADM 819, Religious Activities (issued June 10, 2002) establishes the procedure and standards for a religious accommodation:

applications were denied. Reluctantly, to avoid prison discipline, Meggett agreed to have his hair cut but filed a formal grievance. After his grievance was denied, Meggett filed the petition for review now before this Court.

Meggett's petition alleged that the Department's hairstyle policy is unconstitutional and, thus, sought to have its enforcement enjoined.[5] In response, the Department filed preliminary objections in the nature of a demurrer, which this Court overruled. *Meggett v. Department of Corrections*, 856 A.2d 277 (Pa.Cmwlth. 2004) (*Meggett I*).[6] Thereafter, the Department filed an answer with new matter.[7] Generally, the Department agreed that the Hebrew Israelite faith is a recognized religion, but it denied that Meggett is a sincere adherent and denied that this religion requires the wearing of dreadlocks. The Department further denied that its hairstyle policy targeted African–Americans. After the pleadings were closed, both parties filed motions for summary relief.

 At any time after the filing of a petition for review in an appellate or original matter, this Court may "enter judgment if the right of the applicant thereto is clear." PA. R.A.P. 1532(b).[8] When material facts are disputed, summary relief is not warranted. *The Milton S. Hershey Medical Center of the Pennsylvania State University v. Commonwealth of Pennsylvania*, 788 A.2d 1071, 1075 (Pa.Cmwlth.2001). Both Meggett and the Department agree that there are no material facts in dispute.[9] Where the dispute is a legal one, summary relief is appropriate if the moving party's right to judgment is clear as a matter of law. *Id.* In ruling on an application for summary relief, the Court must view the evidence of record in a light most favorable to the nonmoving party. *Hennessey v. Pennsylvania Board of Pardons*, 655 A.2d 218, 219 (Pa.Cmwlth.1995).

---

The inmate shall obtain written information from his/her outside faith group, including any publications that describe the goals, beliefs, and practices of the group and supply this information to the FCPD for review. DC–ADM 819(G)(2)(c).

5. The petition's prayer for relief requests an injunction and an "order;" it is not clear whether the "order" sought is an injunction or that Meggett seeks a writ of mandamus. We treat the petition as suit in equity.

6. One of *Meggett's* theories was that under the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 22000bb–2000bb–4, the Department's hair policy was subject to a more rigorous standard than had heretofore been understood. However, as we noted in *Meggett I*, this federal statute has been found to exceed Congress's authority insofar as it intrudes upon the State's traditional prerogatives, such as running its prisons, and, thus, was irrelevant to Meggett's action. *Meggett I*, 856 A.2d at 279.

7. In its new matter, the Department asserted the following:

47. Petitioner has not kept Kosher during his imprisonment.
48. It is impossible for the Petitioner to travel to have his head shaved while in prison.
49. Petitioner identifies himself as Hebrew Isrealite/Nazarite [sic].
50. Hebrew Israelite/Nazarite [sic] is not a recognized religion.
51. Petitioner does not sincerely hold the religious beliefs he espouses.
52. Maintaining dreadlocks is not a tenet of Hebrew/Isrealite [sic] faith.
Answer with New Matter, filed Sept. 10, 2004. The Department recognizes the Hebrew Israelite religion but denies that there is a "Hebrew Israelite/Nazarite" religion.

8. PA. R.A.P. 1532(b) states:

(b) Summary relief. At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

9. However, each party believes the other's evidence is inadequate to support any conclusion but the one sought by the moving party.

In support of his motion for summary relief, Meggett offered evidence to show that wearing dreadlocks is a belief of his religion and, thus, should enjoy constitutional protection. Meggett offered no evidence to support his equal protection claim; his challenge there is strictly one of legal argument. In its cross-motion, the Department contends that Meggett's evidence is not adequate to support the conclusion that his hairstyle is dictated by his professed religious belief. However, were this Court to hold otherwise, the Department argues that because its evidence demonstrates that the policy on inmate hair styling advances the state's interest in maintaining an orderly prison, the policy is a permissible infringement upon Meggett's freedom of religious expression. Further, the Department asserts that its rules for "Afro style" hair are based on variances in hair texture, not on race, and, therefore, do not raise a question of racial discrimination.

 Meggett's claims are founded in both the Pennsylvania and United States Constitutions. The United States Supreme Court is, of course, the last word on the scope and meaning of the federal constitution for all state and federal courts. *Hall v. Pennsylvania Board of Probation and Parole*, 578 Pa. 245, 251, 851 A.2d 859, 863 (2004). Similarly, the Pennsylvania Supreme Court is the final authority with respect to the Pennsylvania Constitution.[10] Both constitutions guarantee individuals a right to freedom of religious expression,[11] and both require equal protection of the laws.[12] Our Supreme Court is free to interpret Pennsylvania's Constitution as providing more generous protection to citizens than that provided under the United States Constitution. *Fischer v. Department of Public Welfare*, 509 Pa. 293, 305, 502 A.2d 114, 121 (1985). However, in analyzing the right to equal protection under the Pennsylvania Constitution, our Supreme Court has chosen to be guided by the standards and analysis established by the U.S. Supreme Court in analyzing the Fourteenth Amendment. *Love v. Borough of Stroudsburg*, 528 Pa. 320, 325, 597 A.2d 1137, 1139 (1991). Our Supreme Court

10. It is also the final authority, for state courts, on questions of federal constitutional law until overruled by the U.S. Supreme Court. *Commonwealth v. Cross*, 555 Pa. 603, 613, 726 A.2d 333, 338 n. 4 (1999).

11. The Pennsylvania Constitution states the right to religious freedom as follows:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interference with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

Pa. Const. art. I, § 3. The United States Constitution addresses freedom of religion as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .

U.S. Const amend. I. The Fourteenth Amendment has long been interpreted to make the Bill of Rights, including the First Amendment, applicable to the States as well as to Congress. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

12. Section 1 of the Fourteenth Amendment provides in pertinent part, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Pennsylvania's equal protection provision is set forth in Article I, Section 26 of the Pennsylvania Constitution, which provides,

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

has not been so definitive with respect to religious freedom, but we are not aware of any precedent that would have the Pennsylvania Constitution give broader protection to this right than does the First Amendment. Consistent with the holding of the Pennsylvania Superior Court in *Commonwealth v. Cottam*, 420 Pa.Super. 311, 616 A.2d 988, 997 (1992), therefore, we will follow federal precedent in considering Meggett's freedom of religion claim under the Constitutions of both Pennsylvania and the United States.

With these principles for evaluating Meggett's constitutional claims in mind, we turn to an examination of the cross-motions of Meggett and the Department.

## FREEDOM OF RELIGION CLAIM

To succeed in his freedom of religion claim, the parties agree that Meggett must establish that his desire to wear dreadlocks is a religious belief and that he is sincere in this religious belief. The Department contends that Meggett has not provided evidence sufficient to support ei-

ther conclusion. However, even if we were to find in favor of Meggett on this point, the Department argues that it is entitled to judgment in its favor because the infringement upon Meggett's free exercise of his religion is permissible.

Meggett explains that he accepted the Hebrew Israelite faith in 1998 and consistent with its teachings, has not had his hair cut since 1998. Meggett asserts that the "Hebrew Isrealite [sic] religion is a recognized legitimate faith." Petition for Review, ¶ 42. He contends that the Department's improper refusal to grant him an exception from the hair length policy has burdened his ability to exercise his religion. To support these claims, Meggett offered fourteen exhibits.[13] These exhibits explain the differences between the Hebrew Israelite, Nazarite and Jewish faiths.[14] With the exceptions of three letters, one by Meggett and two by his spiritual advisor, Ronald L. Grimes, the exhibits consist of tracts or bulletins that appear to have been prepared for distribution to adherents of the Hebrew Israelite religion.[15]

PA. CONST. art. I, § 26.

**13.** In considering a motion for summary relief filed pursuant to PA. R.A.P. 1532(b), we follow the appropriate rules of civil procedure where, as here, the matter is addressed to our original jurisdiction. PA. R.A.P. 106 states:

Unless otherwise prescribed by these rules the practice and procedure in matters brought before an appellate court within its original jurisdiction shall be in accordance with the appropriate general rules applicable to practice and procedure in the courts of common pleas, so far as they may be applied.

The Pennsylvania Rules of Civil Procedure that a "record," for purposes of summary judgment, includes the following:
(1) pleadings,
(2) depositions, answers to interrogatories, admissions and affidavits, and
(3) reports signed by an expert witness....

PA. R.C.P. No. 1035(1)-(3). Accordingly, the record, for purposes of each party's motion for summary relief, consists of pleadings, affidavits and expert reports.

**14.** Exhibit 1, a letter to Meggett from Ronald L. Grimes, explains:

I'd like to address what you said in your letter about your sincerity being challenged, namely, that you didn't eat Kosher and you didn't celebrate Rosh Hashanah. First, let me emphatically say that, you should never be concerned with trying to eat Kosher!!! The reason being is that Kosher is a Jewish term and I don't believe you ever claimed to anyone that you were Jewish or a follower of Judaism. You said that you were a Hebrew Israelite and although there are similarities they are vastly different.

**15.** Exhibits 4 and 9, for example, offer a calendar of holy days and explanation of those days. Exhibit 10 discusses the "Issue of

Of particular relevance here is Meggett's Exhibit 8, which was offered by Meggett to explain the Hebrew Israelite dress code. It lists the "signs of identity" for Hebrew Israelites, explaining as follows:

> Some Israelites wear uniforms to express their order, such as the all-white robes worn by the follower of Yahweh Ben Yahweh. Some Israelites wear some type of Mogen–David–[star] as a sign of their national identity. And, there are those Israelites who have made wearing their hair in locks the sign of their nationality. Some Israelites simply wear four-cornered Eastern styled garments; and some wear specially wrapped head-ties to show they are Israelites. Then again, there are those who dress the same as when they were Blacks and Negroes—but now wear a "Keepah" as a sign of their Israeliteness.

Meggett's Application for Summary Relief, Exhibit 8 (emphasis added).

The Department agreed in its pleading that the Hebrew Israelite faith is a recognized religion, but it denied that this religion mandates any particular hairstyle. In support, it offered as evidence a letter it received from Grimes on September 2, 2002, which states, in relevant part, as follows:

> Please realize that in the Hebrew Israelite community it is not uncommon to see both the men and women wear their

hair in long flowing locks as an expression of their life and the spiritual and physical connections to biblical Israel.

The Department's Response and Cross–Application for Summary Relief, Exhibit A (emphasis added). The Department contends that even the most favorable reading of Meggett's evidence, the opposite of what is required, does not prove that the Hebrew Israelite religion requires dreadlocks.

The determination of whether a belief is religious and, therefore, entitled to protection under the First Amendment is a difficult one for a court of law established for discerning law in the secular domain. Acknowledging this difficulty, the Third Circuit drew on U.S. Supreme Court precedent [16] to hold that the threshold requirements of a free exercise of religion claim are that the beliefs be (1) sincerely held and (2) religious in nature, in the inmate's "scheme of things." *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir.1981). If either requirement is not satisfied, "the court need not reach the question, often quite difficult in the penological setting, whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim." *Africa*, 662 F.2d at 1030.

Using the *Africa* test as the starting point for our analysis, we consider, first, the sincerity of Meggett's beliefs. This inquiry has nothing to do with making determinations about the truth of a reli-

---

Leaven" in relation to Passover. For the most part, the authors of these tracts are not identified.

**16.** *See United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). However, as noted by the Third Circuit, the Supreme Court has not "announced a comprehensive definition of religion for cases such as this one." *Africa*, 662 F.2d at 1031. At one time, such an inquiry was not neces-

sary because the exercise of religion simply gave way to law. As noted by Chief Justice Waite, if "professed doctrines of religious belief [are made] superior to the law of the land [it would] in effect ... permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 166, 25 L.Ed. 244 (1878) (holding that a Mormon man was free to believe that it was his religious duty to marry more than one woman, but he was not free to act on that belief.).

gious belief. The purpose of the sincerity inquiry was explained by the Third Circuit as follows:

> while the "truth" of a belief is not open to question, there remains the significant question whether it is 'truly held.' ... Without some sort of required showing of sincerity on the part of the individual ... seeking judicial protection of its beliefs, the first amendment would become "a limitless excuse for avoiding all unwanted legal obligations."

*Africa,* 662 F.2d at 1030 (citations omitted). Here, Meggett explains his belief as follows:

> [I] believe[ ] that the Creator, Yahweh, has mandated not to cut your hair. [I] believe[ ] that strength and spiritual insight flows when in keeping with this belief. Since becoming an Israelite and letting my hair grow, I've become physically and spiritually stronger. My health has improved and I no longer suffer from earlier ailments. My asthma is under control without medication and I'm running 5 miles daily. I haven't had a cold or flu since 1997 when I started to let my hair grow. But each time I was forced to cut my hair by the [Department], I got sick either a cold or flu. As my hair grows back I feel stronger and more in harmony with the Creator.

*Meggett's Brief at 9.* It is impossible, in a motion for summary relief, to find, as fact, that Meggett's expressed beliefs are not "truly held." [17] Meggett's claim passes the first threshold requirement.

We turn, then, to the second *Africa* threshold requirement, namely, that one's sincerely held belief be religious in nature. At issue in *Africa* was Frank Africa's contention that the Department was obligated by the First Amendment to provide him a special raw-food diet. The Third Circuit found Mr. Africa, a "Naturalist Minister" for MOVE, to hold his beliefs sincerely, but he failed to prove that MOVE was a religion. *Africa,* 662 F.2d at 1036.[18] Here, there is no dispute that the Hebrew Israelite faith is a religion. However, the Department argues that because this religion does not require dreadlocks, Meggett fails to satisfy the second threshold requirement. In effect, the Department argues that for the belief to be religious in nature, it must be mandated by that religion.

Meggett's evidence shows that Hebrew Israelites express themselves in a variety of ways. Some wear white robes, and others wear their hair in dreadlocks,

---

17. The Department argues that Meggett's beliefs are not sincere because (1) when he entered the system he was listed as a Protestant, and (2) he has not sustained a Kosher diet. However, Meggett was free to change his religious beliefs after entering the prison. Further, Meggett's spiritual advisor explained that the Hebrew Israelite faith does not require a Kosher diet. *See n. 14, supra.*

18. The Third Circuit explained the test for determining whether a belief system is a religion as follows:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Id.* at 1032. This test has limited utility. String theory, the work of physicists, addresses imponderables; posits a system of beliefs; and has adherents who attend conferences, an "external sign." We disagree that determining whether a belief system is a religion is far more difficult than determining the "difficult question ... [of] whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claims." *Africa,* 662 F.2d at 1030. Indeed, it seems especially beyond the province of the

as does Meggett. Meggett's spiritual advisor stated that "it is not uncommon" to see a Hebrew Israelite follower wearing his or her hair long. In other words, some Hebrew Israelites do not wear their hair long. The only conclusion to draw from this evidence, according to the Department, is that wearing dreadlocks is not a mandate of the Hebrew Israelite faith, but, rather, an option. Meggett rejoins, however, that when his hair is long, he feels stronger and less vulnerable to a cold or flu.[19] In this respect, Meggett's claim is similar to that advanced by the petitioner in *Africa*, who asserted that a raw food diet yielded a health benefit. The Third Circuit concluded that petitioner's diet, however beneficial, was a personal, not a religious, preference. *Africa*, 662 F.2d at 1033–1034.

■ The Department offers no authority for its contention that for Meggett to succeed in his freedom of religion claim, he must show that dreadlocks are mandatory for members of the Hebrew Israelite faith.[20] Dreadlocks appear to be a type of religious expression for Hebrew Israelites, just as wearing a cross is a form of religious expression among Christians. It is true that we are not bound by the *Africa* analysis and, presumably, could add another condition to the *Africa* analysis for determining whether a belief is "religious in nature, in the [inmate's] scheme of things."

*Africa*, 662 F.2d at 1030. In our federal system, a state court's interpretation of the U.S. Constitution is no less authoritative than that of a federal court of appeals in whose circuit the state court is located. *A.L. Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).[21] Our reluctance to add another factor to the *Africa* test, *i.e.*, that only a "tenet" or mandate of a religion is protected, is not because we question our authority to do so, but because we question the wisdom of such a course. To extend protection only to practices mandated by a religion, excluding protection to those religious practices that are optional, would require courts to engage in the study of religious dogma and to make doctrinal rulings. This is beyond the ken of civil courts and their judges. We decline to find that Meggett has failed to meet the threshold requirements of a freedom of religion claim in light of the fact that the Department itself concedes that Meggett's professed religion is recognized as a valid religion.

■ This does not end our inquiry because states may infringe upon the ability of their prison inmates to freely exercise their religious beliefs. In addition, Meggett's petition is grounded in freedom of expression as well as in freedom of religion.[22]

---

judiciary to determine what is, and what is not, a religion.

**19.** It is not clear why Meggett offers his testimonial that long hair makes him physically stronger and better able to deal with asthma and the flu. To the extent it is offered as support for the validity of the Hebrew Israelite faith, it is irrelevant to his legal claim. It is not the province of the courts to render judgments about the truth of a particular religious faith. *Africa*, 662 F.2d at 1030.

**20.** This may, however, be a basis for the Department to deny Meggett a religious exemption from the hairstyle policy.

**21.** *See also, Commonwealth v. Cross*, 555 Pa. 603, 613, 726 A.2d at 333, 338 (1999) (explaining that the Pennsylvania Supreme Court may formulate their own interpretation of the U.S. Constitution and of the Supreme Court precedent).

**22.** In his petition for review, Meggett averred: Petitioner believes and therefore avers that any limitations on the length of an inmate's hair is in violation of the 1st Amendment's freedom of speech and expression and serves no legitimate penological purpose. Petitioner for Review, ¶ 32. Meggett's motion for summary relief does not expressly ad-

Policy DC–ADM 807 has withstood numerous First Amendment challenges. As early as 1974, a three-judge panel upheld the Department's hair style policy for the reason that it advanced prison order, which outweighed the petitioner's constitutional right of expression, assuming such right existed. *Poe v. Werner,* 386 F.Supp. 1014 (M.D.Pa.1974). The panel explained as follows:

> Long hair provides a place for the concealment of contraband, a concern heightened by the fact that the prisoners work outdoors and have open contact visiting. It also impairs the ability of prison officials to identify inmates from their institutional photographs. Finally, the hair regulation can be viewed as furthering the rehabilitative function of the prison of restoring in the inmate population that minimal degree of personal discipline that is essential to a safe and orderly society.

*Poe,* 386 F.Supp. at 1017. Accordingly, the court denied petitioner's request to enjoin the Department's hair policy.[23]

 In reaching this conclusion, the *Poe* court relied upon the U.S. Supreme Court's longstanding recognition that

> [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.

*Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). However, this retraction of privileges does not amount to an "iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Some infringement upon a constitutional right, such as freedom of religion or speech, must be tolerated in light of the fact that "the central objective of prison administration [is] safeguarding institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Bell* also notes that courts should defer to the administrative expertise of prison administrators because prison officials are in a better position than judges ever can be to grasp what is required in the "prison domain" and because the operation of prison facilities is "peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548, 99 S.Ct. 1861. In sum, inmates may expect a limitation upon, but not a total loss of, individual constitutional rights while incarcerated.

 In *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the U.S. Supreme Court established the standard of review for determining whether a prison regulation permissibly infringes upon constitutional rights.[24] Rather than a strict scrutiny standard of review, the lesser standard of "whether a prison regulation that impinges on inmates' constitutional rights is 'reasonably related' to legitimate penological interests" is the appropriate one. *Id.* The Court went on to identify several factors for determining whether there is a reasonable relation between the prison regulation and the governmental interests. First, the

---

vance a free speech theory. We give him the benefit of the doubt that his claim for freedom of religion claim involves both freedom of expression and freedom of religion.

**23.** Because the *Poe* panel held that regulation of long hair had a valid penological purpose, it did not reach the question of whether the right to choose a particular hairstyle was protected by the First Amendment.

**24.** In *O'Lone v. Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the U.S. Supreme Court stated that a regulation is valid if it is reasonably related to legitimate penological interests, such as security.

regulation should operate in a neutral fashion, without regard to the content of the expression. Second, the court should consider whether there are other avenues of expression, at *de minimis* cost to the prison officials, that might be provided inmates. A third factor to consider is the impact of an accommodation to the asserted constitutional right. Finally, the courts should consider any evidence offered by the inmate that the regulation is an "exaggerated response" to prison concerns. *Id.* at 89–90, 107 S.Ct. 2254.

As noted by the Department in its brief, the *Turner* four-part analysis had been employed by courts to evaluate the Department's hair policy even before *Turner* was decided. In *Cole v. Flick*, 758 F.2d 124, 132 (3d Cir.1985), the Third Circuit Court of Appeals held that Policy DC–ADM 807 was not an exaggerated, but rather, a reasonable response to legitimate penological concerns. Thus, the regulation survived a challenge by a Cherokee prisoner that the policy infringed upon his right to exercise his religious beliefs. *Id.* The inmate may prove that the prison regulation is an exaggerated response to security concerns, but he must do so by substantial evidence. *Dreibelbis v. Marks*, 742 F.2d 792, 794 (3d Cir.1984) (upholding Policy DC–ADM 807 against a claim that it infringed upon the inmate's right to practice his religion). Further, courts should defer to the judgment of prison officials on the question of whether a prison regulation is reasonable. *Id.*

Here, the Department offered the affidavit of Lieutenant Steven Datchko, a security officer at SCI–Mahanoy with seventeen years of experience. He explained that limiting hair length eliminates the use of long hair to conceal and move contra-

band; aids staff in the identification of inmates; and advances inmate hygiene. Meggett has offered no evidence in rebuttal. In the absence of evidence that the policy is unreasonable, we defer to the judgment of the prison officials on the need for the policy and its reasonableness. *Dreibelbis*, 742 F.2d at 794. Therefore, whether Meggett's claim arises from protected speech or freedom of religion, the Department's evidence supports the conclusion that its infringement upon that right is a permissible one.

Consistent with long-standing precedent, we hold that Policy DC–ADM 807 does not violate either the Pennsylvania or the United States Constitution with respect to Meggett's right to freedom of religion and speech.

## EQUAL PROTECTION CLAIM

We consider, next, Meggett's equal protection claim. Meggett's petition asserted that Policy DC–ADM 807 discriminated against African–Americans without a legitimate penological reason, stating as follows:

31. Petitioner believes and therefore avers that no legitimate security or penological concerns are addressed by limiting an Afro–American's hair length to 4 inches while allowing Hispanic, Asian and white inmates to wear collar length hair.

\* \* \*

33. Respondent [Department] can offer no data or evidence to suggest that such restrictive measures are necessary for cleanliness or institutional security.

Petition for Review, ¶¶ 31, 33.[25] As noted, Meggett offered no evidence to support his

**25.** The Department, in its answer, responded that these "allegations" present not facts but

legal argument. Its evidence, the affidavit from Lieutenant Datchko, was offered to sup-

assertion that the Department's hair policy does not address a legitimate penological concern, and he offered no ˙evidence to support his discrimination claim. Meggett's equal protection challenge is a facial challenge to the language of the policy, which he believes to discriminate unlawfully and without advancing a legitimate penological goal.

▮▮▮▮▮ Equal protection under the law "does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, ... and [it] does not require equal treatment of people having different needs." *Curtis v. Kline*, 542 Pa. 249, 255, 666 A.2d 265, 267 (1995) (citations omitted). Nevertheless, "a classification must rest upon some ground of difference which justifies the classification and has a fair and substantial relationship to the object of legislation." *Id.* at 255, 666 A.2d at 268. To determine whether a classification is justified, courts first must choose the appropriate standard of review. A classification that implicates a suspect class, such as race, or implicates a fundamental right, such as freedom of religion, is subject to strict scrutiny. *Smith v. City of Philadelphia*, 512 Pa. 129, 138, 516 A.2d 306, 311 (1986).[26] Where the classification implicates an "important" but not fundamental

right, a "heightened" standard of review is applied, but where the classification involves neither a fundamental nor an important right, the rational basis standard of review is applied. *Id.*

In *Wise v. Pennsylvania Department of Corrections*, 690 A.2d 846 (Pa.Cmwlth. 1997), we examined Policy DC–ADM 807 against a challenge of sex discrimination. The petitioner asserted that because the policy restricted the length of hair for male inmates, and excluded female inmates from this restriction, it violated equal protection of the laws. Following the analysis of *Poe* and *Turner*, we observed that an inmate, by the very fact of his or her conviction and incarceration, has diminished civil rights. *Id.* at 848. In other words, we believed that the equal protection standard of review is reduced where the governmental policy under challenge relates to the operation of a prison.

▮▮▮▮▮ *Wise* held that Policy DC–ADM 807 did not violate equal protection, and although this conclusion may have been correct, the standard of review used to reach that conclusion may not have been.[27] Recently, the U.S. Supreme Court clarified that *Turner* was never intended to extend to equal protection cases that arise in prison that implicate suspect classes.[28] In

---

port the Department's position that Policy DC–ADM 807 advanced a legitimate penological interest in prison security and hygiene.

**26.** To survive strict scrutiny, the classification must (1) promote a compelling state interest, and (2) be narrowly tailored to that interest. *Johnson v. California*, 543 U.S. 499, 513–14, 125 S.Ct. 1141, 1151, 160 L.Ed.2d 949 (2005).

**27.** *Johnson* explained that the *Turner* standard may be applied in First Amendment and due process claims but not in Eighth Amendment cruel and unusual punishment cases. *Johnson*, 543 U.S. at 510–11, 125 S.Ct. at 1149. *Johnson's* clarification of *Turner* may

or may not have implications for equal protection cases that do not involve suspect classifications but rather "sensitive" or "quasi-suspect" classifications. *See Small v. Horn*, 554 Pa. 600, 615, n. 15, 722 A.2d 664, 672 n. 15 (1998) (explaining that gender and legitimacy are quasi-suspect). We do not decide here whether a legitimate penological purpose will permit that which would constitute unlawful sex discrimination in any other context.

**28.** Nevertheless, the *Turner* standard of review may be appropriate in equal protection cases that relate to fundamental rights, such as freedom of religion. It is not contended

*Johnson v. California*, 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005), the Supreme Court considered an equal protection case that considered raising racial discrimination. It stated that "*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny." *Id.* at 505, 125 S.Ct. at 1146 (quotations omitted) (emphasis in original).[29] In short, strict scrutiny is the standard of review for examining all racial classifications, even those that apply only in the prison context, and not the more lenient *Turner* standard of review. *Johnson*, 543 U.S. at 509, 125 S.Ct. at 1148–1149.

The first significant case to consider an equal protection challenge to a prison hair regulation was *U.S. ex. rel. Goings v. Aaron*, 350 F.Supp. 1 (D.Minn.1972). In that case, Goings, an Oglala Sioux, challenged a regulation that expressly permitted Afro hairstyles and mustaches but prohibited long hair, requiring him to break a "Ceremonial Indian vow" to "return to the Old Indian Traditions and religion, a part of which included not cutting his hair." *Goings*, 350 F.Supp. at 2. Goings challenged

the regulation on both First Amendment and equal protection grounds; however, we review the case here for its relevance to Meggett's equal protection claim.[30]

The hair policy at the federal correctional institution challenged by Goings stated, in relevant part, as follows:

c. Haircuts must be in accordance with the following guidelines: Hair must not extend over the ears on the sides, over the collar in the back, or over the eyebrows in the front.

d. Afro-style haircuts are permitted for the Black inmates. Shape of the Afro hair style must be maintained within limits pictured and described on the attached drawings. Large bushy, basket shaped styles are not permitted.

*Id.* at 3. As is the case with Policy DC–ADM 807, the federal prison policy did not permit hair to extend over the collar. Notwithstanding this limit, "[b]lack inmates" were permitted to wear an Afro-style haircut so long as they were not "[l]arge, bushy, basket shaped styles." *Id.*

that Policy DC–ADM 807 uses classifications based upon religious groups.

29. As stated in *Johnson*,

We have never applied *Turner* to racial classifications. *Turner* itself did not involve any racial classification. . . . [W]e have applied *Turner's* reasonable-relationship test only to rights that are "inconsistent with proper incarceration." . . . This is because certain privileges and rights must necessarily be limited in the prison context. . . . Thus, for example, we have relied on *Turner* in addressing First Amendment challenges to prison regulations, including restrictions on freedom of association. . . .

*Johnson*, 543 U.S. at 510, 125 S.Ct. at 1149 (quotations omitted). The Court further stated that, "*Turner* is too lenient a standard to ferret out invidious uses of race." *Id.* at 513, 125 S.Ct. at 1151. In support of using a strict scrutiny test over the *Turner* reasonable-rela-

tionship test in claims involving racial discrimination in a prison, the Court stated,

The right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*. It is not a right that need necessarily be compromised for the sake of proper prison administration. On the contrary, compliance with the Fourteenth Amendment's ban on racial discrimination is not only consistent with proper prison administration, but also bolsters the legitimacy of the entire criminal justice system. Race discrimination is "especially pernicious in the administration of justice."

*Id.* at 510–11, 125 S.Ct. at 1149 (quotations omitted).

30. The district court rejected Going's First Amendment claim, holding that his freedom of religion could be limited by "reasonable rules of conduct," *i.e.*, the prison hair policy, without violating the constitution. *Id.* at 5.

Goings challenged the regulation, which plainly made distinctions on race, because it disadvantaged him, an Oglala Sioux, who was unable to grow either an Afro or a moustache and, thus, could not take advantage of the special exceptions given to inmates of other races. In rejecting Goings' argument that equal protection entitled him to a race-based exception, the District Court explained as follows:

> [t]he court learned at the hearing, upon which facts both counsel seemed in agreement, that Indians do not and apparently cannot grow facial hair and that hair on blacks is of a different genetic type tending to grow tightly curled and will not grow as does the hair of the average Caucasian or Indian. As to black prisoners, the regulations recognize this difference and so permit [a] limited or modified Afro hairstyle....

*Id.* at 5. Because the Court found the regulation's classifications to be reasonable, the regulation was found not to violate equal protection.

The *Goings* precedent is interesting but no longer very persuasive. First, the racial classifications expressed in the federal prison regulation were not considered under the strict scrutiny standard of review, as is required under *Johnson*, 543 U.S. at 504–06, 125 S.Ct. at 1146. Second, it is difficult to posit any justification for using race as a classification in a prison regulation designed to achieve security and hygiene.

Policy DC–ADM 807 is a differently drafted regulation. Quite properly, it nowhere mentions race. It does not make sense to do so because an "Afro style" can be worn by a person of any race. It was the hairstyle choice of the late Jimi Hendrix, who was African–American, and of another well known musician, Art Garfunkel, who is not. "Afro style" is a term that denotes a cultural norm, not a member of a race. When one refers to the "Mohawk" style of haircut, one does not refer to a member of the Native American tribe of the same name, but to a cultural norm. Indeed, "Mr. T.," an actor who is not a Native American, favors a Mohawk. These various hairstyle choices, including dreadlocks, the style at issue here, are available to persons of any race. The words that denote a cultural norm may relate back to the ethnic or racial group that originated the form of expression, but that does not make the words themselves racial.

■ Meggett's premise is that Afro hairstyles can be sported only by African–Americans.[31] This premise is unfounded because an "Afro style" can be chosen by a person of any race. Caucasian inmates can have naturally curly hair and, if not, chemical agents may be used to curl otherwise straight hair. Similarly, African–Americans may have different types of hair. Without specific reference to race, Policy DC–ADM 807 permits a variety of hairstyles that do not fall below the collar and it clarifies that to meet this standard, Afro styles must not exceed four inches. This classification is based upon differences in hair texture.[32] The standards

---

**31.** One cannot make a disparate impact analysis in the context of a constitutional equal protection case. *See Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). For a thorough discussion of this point and others relating to questions of prison grooming, see Mara R. Schneider, "Splitting Hairs: Why Courts Uphold Prison Grooming Policies and Why They Should

Not," Michigan Journal of Race and Law 503 (Spring 2004).

**32.** Four inches of straight hair from the base of the neck would extend well beyond the top of the collar; in this respect, the standard for Afro-styled hair appears more liberal than the standard for persons with straight hair. In other respects, it may be more restrictive. An inmate with four inches of curly hair may

achieve the same end—keeping hair fairly, but not unreasonably, short for all inmates. We conclude, therefore, that because the Department's regulation on hair style and length is neutral as to race, its classifications are subject to the rational basis standard of review.

The rational relationship test requires that the challenged policy promote a legitimate state interest and that the classification in the policy be reasonably related to that state interest. *Curtis,* 542 Pa. at 257, 666 A.2d at 269. If any state of facts can be envisioned to sustain the classification, equal protection is satisfied. Indeed, courts are free to hypothesize reasons why the legislature created the particular classification at issue and if some reason can be founded it will be sustained even if the reason seems not very wise. *Id.* In this case, the Department's policy advances prison safety, security, identification, and sanitation efforts. These purposes have long been held to constitute a legitimate state interest. *Wise,* 690 A.2d at 849; *Poe,* 386 F.Supp. at 1018. The classification in the policy, differentiating by hair type, is reasonably related to the state's goal.

The goal is short, clean hair that does not fall below the collar. Persons with curly-type hair may satisfy that goal even if their hair is four inches in length. Persons with straight hair less than four inches may not. In short, the classification is reasonably related to attaining the goals of the policy. Thus, Policy DC–ADM 807 satisfies equal protection of the laws.

### CONCLUSION

We hold Policy DC–ADM 807 to be constitutional. Whether Meggett's ability to wear dreadlocks is a constitutionally pro-

tected right of expression, religious or secular, is of no moment. It is a question we need not reach because the Department's evidence supports the conclusion that Policy DC–ADM 807 advances a valid penological objective and does so reasonably. Therefore, the policy's infringement upon Meggett's freedom of hairstyle choice is permissible. Finally, because Policy DC–ADM 807 does not classify by race, it is subject to, and easily survives, the rational relationship test for testing whether a state's policy violates equal protection of the laws. For these reasons, Meggett's motion for summary relief must be denied, and the Department's motion for summary relief granted.

### O R D E R

AND NOW, this 13th day of February, 2006, Petitioner's motion for summary relief in the above-captioned matter is hereby denied. Respondent the Department of Correction's cross-motion for summary relief is granted.

---

appear to have shorter hair than one with straight hair falling to collar.