DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Troy Whitaker, appeals the judgment of the Fulton County Court of Common Pleas, which imposed a term of 12 months incarceration upon finding that he violated his community control when he was unsuccessfully discharged from a residential treatment program. For the following reasons, we reverse.
 {¶ 2} On March 6, 2006, appellant entered a plea of guilty to assault, a violation of R.C. 2903.13(A) and (C)(3), a felony of the fourth degree. He was sentenced to four years of community control and a suspended term of 12 months incarceration. The trial *Page 2 
court imposed four conditions upon appellant's community control: 1) receive "no less than a successful discharge" from the SEARCH program, a residential treatment facility, 2) abstain from alcohol or establishments which serve it, 3) seek and maintain employment or a full-time education, 4) pay a probation supervision fee.
 {¶ 3} On April 10, 2006, the state filed a motion to revoke appellant's community control based on his unsuccessful discharge from the SEARCH program. The motion claimed that appellant willfully refused to cut his hair as required by the program's Resident's Appearance and Grooming Policy ("grooming policy").
 {¶ 4} Appellant reported that he was Native American during his post-sentencing interview and during his initial evaluation by the program's intake worker. He was informed by the intake worker that he would have to cut his hair to comply with the grooming policy, which stated, "Hair will not extend over the ears of the shirt collar, no pony tails, rat tails, etc." Appellant stated his resistance to cutting his hair, explaining that he was Native American and his long hair was "my true identity and who I am." Eventually, appellant signed his acceptance of the grooming policy, indicated that he would cut his hair, and was accepted into the program.
 {¶ 5} On March 31, 2006, the day after his acceptance into the program, appellant filed a "resident grievance form." In it, he stated, "I do not want to cut hair off [sic]. It's against all I believe in. Could we work out anything on this? I could keep it pulled back and down my shirt. I understand if I were sent to prison I'd have to probly [sic] get it cut also, I am not full Indian but my spirit and soul are unfortunately." The grievance was *Page 3 
marked "resolved" next to a staff note stating, "One week stay; must provide proof of being Native American; further investigation into legalities will be done."
 {¶ 6} On April 10, after appellant failed to provide any proof that he was Native American, the program charged appellant with a rule violation for refusing to cut his hair. When appellant waived his right to a hearing, he was discharged from the program.
 {¶ 7} On May 3, 2006, the trial court held a hearing on the state's motion to revoke appellant's community control. Appellant testified that he is one-quarter Cherokee, but that he never registered with the Bureau of Indian Affairs; that his grandmother was Cherokee; that his mother went on a spiritual journey and told appellant that his spirit guide is a phoenix. His mother and grandmother are now deceased. He explained that he has been "living their way of religious beliefs" since the 1970's. His wife, Jessica Whitaker, is Aztec, and they practice their religious beliefs together. As to the manner in which they express or practice their beliefs, appellant explained, "I do about all that I can," which includes fasting, vision questing, sweat lodges, owning a dream catcher, not cutting his hair, and not drinking alcohol.
 {¶ 8} He had only cut his hair on three prior occasions: when he entered the Navy in 1978, when he was incarcerated in 1981, and a year prior when his girlfriend died. He stated his belief that cutting one's hair takes away one's strength, or warrior spirit, explaining, "It's the power you possess. Yea. It's like a medicine. They speak of medicine, your power, your strength, your spirit. It's all combined." Upon questioning by his counsel and the state, he expressed a basic knowledge of Cherokee history, *Page 4 
including their geographic origins and the Trail of Tears. As to his ethnicity, appellant stated, "My mom is deceased, so is my grandmother. I'd have to personally go out and get the information because I have no family members really that could do that for me. I wrote my wife while I was in the SEARCH program but they said that wasn't acceptable."
 {¶ 9} At the conclusion of the hearing, the trial court stated, "Well, first of all one of the first things that I learned as a lawyer is that I may know something to be true, but I may not be able to prove it. And [appellant's] problem is that he's not been able to prove to the satisfaction of the people at the SEARCH program, nor to the court here today that he is in fact Native American. It's strictly not a — unfortunately there is a failure of proof in that matter." The court then made two findings: First, that "there is a compelling state interest in allowing that SEARCH program to continue and to operate for the purpose of allowing a rehabilitative efforts [sic] in the state," and second, that "there is no further least restrictive options [sic] available other than to have a hair cut." The court then imposed the suspended term of 12 months incarceration.
 {¶ 10} While appellant does not label the issues he raises as assignments of error, he sets forth three issues, which we jointly review:
 {¶ 11} "I. Did the appellant, a Native American, willfully violate his community control when he refused to cut his hair?
 {¶ 12} "II. Did the treatment facility violate the appellant'sfirst amendment freedom of religion [sic] by ordering the defendant to cut his hair? *Page 5 
 {¶ 13} "III. After the appellant presented a prima facie case, did the State meet both prongs of its burden?"
 {¶ 14} The Ohio Supreme Court requires the application of strict scrutiny to claims that a state regulation violates a person's right to freely exercise the religion of their choice. Humphrey v. Lane (2000),89 Ohio St.3d 62, syllabus. Thus, we review the grooming policy to determine whether it "serves a compelling state interest and is the least restrictive means of furthering that interest." Id.
 {¶ 15} Appellee urges against applying strict scrutiny, citingOregon Dept. of Human Resources, Emp. Div. v. Smith (1990),494 U.S. 872, 884. The First Amendment to the United States Constitution grants protection to prisoners to freely exercise the religion of their choice only to the extent that it does not interfere with a prison policy "reasonably related to legitimate penological interests." O'Lone v.Estate of Shabazz (1987), 482 U.S. 342; Turner v. Safley (1987),482 U.S. 78. This "reasonableness" test is also known as the "Turner/O'Lone reasonableness test." Francis v. Keane (S.D.N.Y., 1995),888 F.Supp. 568. Humphrey, however, noting that the U.S. Constitution is merely a "floor below which state court decisions may not fall," found that Section 7, Article I of the Ohio Constitution grants individuals broader free exercise rights than the First Amendment to the United States Constitution. Humphrey, 89 Ohio St.3d at 68, quoting Arnold v.Cleveland (1993), 67 Ohio St.3d 35, paragraph one of the syllabus. We have also examined federal cases brought under the Religious Land Use Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), enacted in response to Smith, which *Page 6 
requires the application of strict scrutiny to prison inmates' claims that their right to free exercise had been violated by a prison policy or regulation.
 {¶ 16} The Humphrey plaintiff, a Native American employed by the Ohio Department of Rehabilitation and Correction, challenged the religion-neutral grooming policy of his employer. Here, as inHumphrey, the challenged grooming policy is religion-neutral. We therefore apply a three-part analysis. First, appellant "must show that his religious beliefs are truly held" and that the policy "has a coercive affect against him in the practice of his religion."Humphrey, 89 Ohio St.3d at 68. Next, the state has the burden to prove both that the "regulation furthers a compelling state interest" and that the "regulation is the least restrictive means available of furthering that state interest." Id at 69.
 {¶ 17} Appellee argues that Humphrey's strict scrutiny test should not apply to appellant, because he is not an employee, but a resident of a treatment facility. However, considerations of the differences may be accomplished by consideration of the nature of the state interest asserted and the least restrictive means which may be employed by the facility to further the asserted interest. Differences between prison employees and prison inmates have been considered in federal courts by balancing the context as part of the applicable standard of review. Compare, Smith v. Ozmint (D.S.C., 2006), 444 F. Supp.2d 502 (Rastafarian inmate), Francis v. Keane, supra (Rastafarian employees).
 {¶ 18} The trial court found that appellant failed to establish a prima facie case because appellant "failed to prove that he is Native American and that his religious *Page 7 
beliefs are sincerely held." Clearly, however, given the court's statements at the hearing, the court relied heavily on appellant's lack of proof of his racial identity.
 {¶ 19} The trial court cited no authority, and our searches reveal no authority, in support of its conclusion that appellant is required to prove a racial or ethnic heritage in order to sincerely hold his religious beliefs. Appellee points to the appellant inHumphrey, who was able to prove he was Native American as he had parents and siblings living on an Indian reservation and had enrolled as a member of the Shoshone-Bannock tribe. Humphrey, however, was raised as a Christian. If his free exercise claim was rooted in a violation of his free exercise of the Christian religion, would his Native American heritage have barred his claim? Neither does appellant have to prove that he belongs to a particular Native American religious institution. "Merely because plaintiff is not a member of the Cherokee nation or the Native American worship group at the prison does not mean that his belief is insincere. The Supreme Court has rejected the notion that membership in a religious organization is a prerequisite for religious convictions to be judged sincere." Mosier v. Maynard (C.A. 10, 1991),937 F.2d 1521, 1523, citing Frazee v. Department of Employment Sec.
(1989), 489 U.S. 829, 834. Although the SEARCH program and the trial court would have "proof of appellant's racial identity to accept his claim, a central feature of many religions is accessibility independent of racial or ethnic heritage. Moreover, "[m]en may believe what they cannot prove." U.S. v. Ballard (1944), 322 U.S. 78, 86. *Page 8 
 {¶ 20} The only question which the trial court should have addressed was whether appellant's religious beliefs were sincerely held. On this point, "[c]ourts must be cautious in attempting to separate real from fictitious religious beliefs." Ochs v. Thalacker (C.A. 8, 1996),90 F.3d 293, 296. That is, courts should not inquire into the truth or falsity of the religious tenets asserted. Courts may, however, inquire as to whether the religious practice is optional or a matter of personal choice, or whether it is a central tenet of the religion. "[W]hile the `truth' of a belief is not open to question, there remains the significant question whether it is `truly held.' * * * Without some sort of required showing of sincerity on the part of the individual * * * seeking judicial protection of its beliefs, the first amendment would become `a limitless excuse for avoiding all unwanted legal obligations.'" Meggett v. Pennsylvania Dept. of Corrections (2006), 892 A.2d 872, 881, citing Africa v. Com. of PA (C.A. 3, 1981),662 F.2d 1025, 1030.
 {¶ 21} The sincerity of a person's religious belief also does not hinge on how devout the person has been in the past. On cross-examination, the prosecutor asked appellant whether drinking was a part of his religious beliefs; appellant was intoxicated at the time he committed assault. Appellant replied that he had not drunk alcohol in over 14 years, and he recognized that his lapse was against his religious beliefs. The prosecutor's question was completely irrelevant; it was akin to asking a Christian whether committing a sin is part of their religious belief, and then finding that, if the person admitted to having sinned, the person was not Christian. If the state's argument were valid, then all prisoners' claims of religious faith would be suspect. Prisoners do not lose their right to *Page 9 
freely exercise their religion by virtue of their incarceration.Cruz v. Beto (1972), 405 U.S. 319, 321. See also, Meggett, supra at 881, rejecting state's argument that inmate's belief in tenets of Hebrew Israelite faith not sincere because inmate listed "Protestant" on his admittance form and did not follow kosher diet.
 {¶ 22} Also, a particular expression of a religion does not have to be mandatory for its adherents in order for the expression to be protected. In Meggett, the court found that although wearing one's hair in dreadlocks was optional for Hebrew Israelites, it was nonetheless a protected expression of faith. "To extend protection only to practices mandated by a religion, excluding protection to those religious practices that are optional, would require courts to engage in the study of religious dogma and to make doctrinal rulings. This is beyond the ken of civil courts and their judges." Meggett, supra at 882. See, also,Teterud v. Burns (C.A. 8, 1975), 522 F.2d 357, 361-362, rejecting state's argument that inmate must prove that wearing long braided hair was central tenet of Native American religion, stating, "This is not the law. Proof that the practice is deeply rooted in religious belief is sufficient. It is not the province of government officials or court to determine religious orthodoxy." Id. at 360.
 {¶ 23} Courts across the United States have recognized that refraining from cutting one's hair is a central tenet of Native American spiritual beliefs. Warsoldier v. Woodford (C.A. 9, 2005), 418 F.3d 989 (Cahuilla);Mosier v. Maynard, supra (Cherokee); Iron Eyes v. Henry (C.A. 8, 1990)907 F.2d 810, 813 (Sioux); Pollock v. Marshall (C.A. 6, 1998),845 F.2d 656 (Lakota); Thunderhorse v. Pierce (E.D.Tex., 2006), 418 F.Supp.2d 875 *Page 10 
(Algonquian shaman). Although appellee argues in its brief that appellant's belief is more similar to a personal philosophy than a religion, given the volume of case law saying otherwise, we cannot agree. In Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah
(1993), 508 U.S. 520, 531, the court held that the traditional association of animal sacrifice and religious worship rendered the practice by members of Santeria, a hybrid African/Catholic faith mandating animal sacrifice, worthy of First Amendment protection. Likewise, given the long, historical association of Native American spirituality with the prohibition against cutting one's hair, appellant's belief is "sufficiently rooted in religion" and is not "deemed bizarre or incredible." Id. See, also, Sutton v. Rasheed(C.A. 3, 2003), 323 F.3d 236, 252 (writings of Elijah Mohammad and Nation of Islam "sufficiently rooted in religion" to warrant protection). Thus, we disregard appellee's assertion at the hearing that appellant's belief was insincere because "he doesn't seem to understand that the length of hair symbolizes strength, not spirit." In fact, appellant had analogized his belief against cutting his hair to Samson of the Old Testament.[1] Moreover, "beliefs need not be acceptable, logical, consistent, or comprehensible to others to meritFirst Amendment protection." Hialeah, supra at 531.
 {¶ 24} The state did not refute appellant's assertion that he has only cut his hair three times since the 1970's. One of those times was because appellant was in mourning. He testified that he and his wife try their best to maintain a lifestyle consistent with *Page 11 
Native American spirituality. His lack of verifiable "proof that he has practiced his beliefs in an institutional setting does not undermine the sincerity shown by practicing his beliefs for this long period.Mosier, 937 F.3d at 1523 (inmate held sincere believer in Native American religion despite "no external evidence that he has been practicing his native traditional beliefs"). But see, Caldwell v.Burnett (W.D. Mich, 2006), slip copy, No. 1:05-CV-586 (changing faiths five times in two years combined with no grasp of basic principles of Judiasm supported conclusion that inmate's belief not sincerely held). Appellant has also clearly demonstrated that the policy had a coercive effect. Upon his refusal to cut his hair and his inability to provide proof of his ethnic heritage, appellant was placed in segregation and discharged from the program. We therefore find, pursuant toHumphrey, that appellant has established his prima facie case.
 {¶ 25} Next, the burden shifts to the state to prove a compelling interest underlying its grooming policy and to prove that it employed the least restrictive means to meet that interest. With respect to the program's interest in maintaining its grooming policy, appellee contended at the hearing that the program had a "legitimate interest in maintaining order among the inmates." It also asserted an interest in maintaining a military-style atmosphere. The trial court did not specify what compelling interest it found, only that one existed. We doubt that an interest in preserving a military-style atmosphere exists where residents are allowed to wear earrings and their own clothing. However, prison security has been repeatedly found to be a compelling interest.Warsoldier v. Woodford (C.A. 9, 2005), 419 F.3d 989, 998. *Page 12 
 {¶ 26} Assuming, arguendo, that appellee has demonstrated a compelling interest for its grooming policy, appellee has not demonstrated that forcing appellant to cut his hair is the "least restrictive means" of furthering that interest. We consider the context of the program: residents are allowed to wear their own clothing, to grow neatly-maintained beards, and to wear small earrings. Also, the program allows a resident to request special dietary meals because of "practiced religious beliefs." The probation officer and the program's own policies indicate that the program is much less restrictive than a minimum security prison. Courts may consider the institutional setting compared to more or less restrictive institutions. See Warsoldier,418 F.3d at 999-1000, rejecting argument that required short hair in minimum security state prison when other state and federal maximum security prisons either had no hair length policies or provided religious exemptions.
 {¶ 27} Appellant has pointed to at least two alternatives — wearing his hair braided and down his shirt or wearing a hat — which would have fully accommodated his religious beliefs with a minimal disruption to the program's objectives. Appellee has not successfully demonstrated that these alternatives would undermine safety or security. These accommodations would have no less impact than, and would be compatible with, the program's allowance of males to wear small stud earrings, beards, and non-uniform, personal clothing. See, e.g., Wolf v.Ferguson (W.D. Ark., 2006), No. Civ. 04-5177, 2006 WL 375920 (allowing a Cherokee inmate to keep a prayer feather compatible with allowing inmates to keep pencils in cells); Benjamin v. Coughlin (C.A. 2, 1990), *Page 13 
905 F.2d 571, 576-577 (allowing Rastafarians to keep long dreadlocks pulled back from face in ponytail has no more than a "de minimus effect on valid penological interests").
 {¶ 28} Granted, there will be certain circumstances in which there will be no less restrictive means of advancing an institution's compelling interest in security, aside from curtailing an inmate's religious practices. See, e.g., Benjamin, 905 F.2d at 579 (Rastafarians not allowed to wear large and loose fitting "crowns" which may conceal contraband, although Jewish and Muslim inmates permitted to wear religious headgear); Derrick v. Ward (C A. 10, 2004), 91 Fed.Appx. 57 (inmate, a member of the Church of Jesus Christ Christian of the Aryan Nations, properly barred from conducting segregated group services and his isolation from general prison population necessary to prevent racial violence); Ochs v. Thalacker, 90 F.3d at 296-297 (security interest advanced by random cell assignments outweighed Church of Jesus Christ Christian inmate's belief that he could not share cell with African-American). This is not such a case. The errors appellant has raised are well-taken.
 {¶ 29} For the foregoing reasons, appellant's judgment of conviction is vacated and this matter is remanded for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Fulton County.
 JUDGMENT VACATED. *Page 14 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
William J. Skow, J., Thomas J. Osowik, J., CONCUR.
Mark L. Pietrykowski, P.J., CONCURS IN JUDGMENT ONLY.
[1] "No razor has ever come on my head; for I have been a Nazirite to God from my mother's womb. If I am shaved, then my strength will go from me, and I will become weak, and be like any other man." Judges 16:17, World English Bible. *Page 1